Filed 3/3/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                   )

                                     )

        Plaintiff and Respondent,    )

                                     )           S086269

        v.                            )

                                     )      Riverside County

JONATHAN KEITH JACKSON,     )   Super. Ct. No. CR-69388

                                     )

        Defendant and Appellant.     )

_____)

A jury convicted defendant Jonathan Keith Jackson of the first degree murder of Monique Cleveland (Pen. Code, § 187),[1] the willful, deliberate, and premeditated attempted murder of Robert Cleveland (§§ 664, 187), and being a felon in possession of a firearm (former § 12021, subd. (a)(1), now § 29800, subd. (a)).  The jury found true the allegations that defendant inflicted great bodily injury upon the attempted murder victim (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)), that he personally used a handgun in the commission of the murder and attempted murder (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)), and that a principal was armed with a handgun in the commission of the murder (§ 12022, subd. (a)(1)).  The jury also found true the special circumstance that the murder was committed while defendant was engaged in the commission or attempted commission of a robbery.  (§ 211; former § 190.2, subd. (a)(17)(i), now § 190.2,

---

[1]    All further statutory references are to this code unless otherwise indicated.

subd. (a)(17)(A).)[2]  The jury, however, was unable to reach a penalty verdict as to the murder conviction, and the court declared a mistrial.  At the penalty retrial, the jury returned a verdict of death on the murder conviction.  Appeal to this court is automatic.  (§ 1239, subd. (b).)

As we explain below, we find no prejudicial error at the guilt or penalty phase of defendant's trial.  We therefore affirm the judgment in its entirety.

## I. FACTS

### A.  The Guilt Phase

Robert Cleveland (Robert) and his wife, Monique Cleveland (Monique), were shot during an attempted robbery at their residence.  Monique was shot in the face and died.  Robert survived gunshot wounds to his face, upper back, and abdomen.  The evidence included Robert's account of the crimes and testimony from two witnesses who heard defendant, at separate times, confess to the crimes.

#### 1.  The Prosecution Case

In June 1996, Robert and Monique lived in a remote area of Mead Valley. Robert was a drug dealer who regularly sold to members of the Mead Valley Gangster Crips, including defendant, whom Robert knew by the name "Valley J." Robert conducted many drug transactions in his home and often hid drugs in a light fixture in a recessed part of the kitchen ceiling.

---

[2]      Additionally, it was determined at a bench trial that defendant suffered a felony conviction of robbery on October 19, 1992 (§§ 211, 667, subd. (a)), that defendant served a prison term for that offense and failed to remain free of prison custody and committed another offense resulting in a felony conviction within five years subsequent to the conclusion of that prison term (§ 667.5, subd. (b)), and that defendant's October 19, 1992 robbery conviction was a serious and violent felony (§§ 667, subds. (c), (e), 1170.12, subd. (c)).

One night in June 1996, members of the Blanton family, who lived nearby, heard multiple gunshots. Shortly thereafter, they received a call from Robert asking for help. Robert had also called 911 to report the shootings.

Michael Blanton and his two daughters rushed to the Cleveland home, where they found Robert slumped on the back porch, bleeding from gunshot wounds. Robert could barely speak but said he had been shot by Valley J. Monique was found in the hallway; she had been shot in the face and was already dead. Michael Blanton noticed that the plastic cover from the light fixture in the kitchen ceiling was on the ground.

When police officers arrived at the scene, Robert was struggling to remain conscious. He told the responding officers that Valley J. and two or three other individuals had tried to rob him, and that Valley J. had shot him. Inside the house, the police found "Vally J" written in blood on the kitchen floor. In the bedroom, the police located a phone book listing a number for "Valley J."; that number corresponded to the house where defendant's girlfriend lived. The police also discovered a package of rock cocaine in the light fixture in the kitchen. A total of $507 was found in two different pairs of pants belonging to Robert.

Robert underwent multiple surgeries to repair the gunshot injuries to his face, upper back, and abdomen. While recuperating in the hospital, Robert identified a photograph of defendant as Valley J.

During a search of defendant's grandparents' house, the police recovered a green folder with the written notation, "Mista Valley Jay, MVGC Crips." The folder contained paperwork bearing both defendant's real name and the moniker "Valley Jay." Defendant was later taken into custody in Los Angeles for drinking in public; he gave the arresting officer a couple of false names.

Robert was one of the three main witnesses in the guilt phase, and he testified as follows. On the night of the shooting, defendant came to Robert's

3

house in a minivan containing at least three other individuals. Defendant got out and knocked on the door. As Robert picked up his .45-caliber handgun and went to answer the door, he heard Monique go into the bathroom down the hall. Robert let defendant in and locked the door behind him. Defendant owed Robert $150 from a previous drug transaction and wanted to get additional drugs. Robert told defendant he did not have any drugs for him that night and said they could discuss the matter again the next morning. During the course of this conversation, Robert set his gun down on the kitchen counter.

As defendant walked toward the door to leave, he suddenly pulled out a gun and shot Robert in the face from one or two feet away. Robert fell to the floor and looked up to see defendant struggling with his gun, which apparently had jammed. As Robert started to pull himself up from the floor, defendant opened the door. One of defendant's companions then entered and shot Robert in the side while saying, "Where's the money? Where's the drugs?" and, "Let's get the bitch too." At least one other person also entered the house. When the men asked where the drugs were hidden, Robert pointed to the light in the recessed kitchen ceiling and then heard the light cover hit the ground. Robert began losing consciousness and was only vaguely aware of hearing additional gunshots. He did not recall being shot a third time. After the men left, Robert regained consciousness. Thinking he was dying, Robert wrote defendant's name in blood on the kitchen floor and then somehow managed to call for help. Although drugs and large sums of cash had been in the house, it appeared nothing was taken.

The second main witness was Kevin Jackson (Jackson), who was unrelated to defendant. Jackson testified that a day or two after the shooting, he was smoking marijuana with defendant and "Alex" and asked whether they had heard that Robert and Monique had been shot and killed. Defendant replied, "Yeah. So what?" A short time later, defendant told Jackson, "Don't trip, but I did that."

4

Defendant then described to Jackson a version of the events that largely tracked Robert's testimony. Defendant said he had gone to purchase drugs from Robert, but there had been a dispute about the money defendant owed Robert. Defendant felt that Robert had "disrespect[ed]" him, and defendant decided "to take what he came for instead of paying for it." Defendant left the house and went to the car where his friends were waiting. He told them he was going to "jack" Robert and "take everything [he] had." Defendant returned to the house, and Robert answered the door holding a gun. When Robert put the gun on the counter, defendant pulled out his own gun. Robert was substantially bigger than defendant, and he jumped at defendant and tried to take defendant's gun. Defendant had recently been hospitalized following a motorcycle accident and "couldn't take a chance on [Robert] grabbing him," so defendant stepped back and shot Robert. Defendant then let in his "homies," and one of them told him to finish what he started. Defendant found Monique in another part of the house. While she was down on the floor, he grabbed her by the hair and asked her where the money was. Monique replied, "What money?" Defendant then "blew her brains out," using a gun he had borrowed from one of his cohorts. During their conversation, defendant opened a nightstand drawer and showed Jackson the gun he used to shoot Robert.

The third main witness was Kevin Jackson's younger brother, Donald Profit, who was 14 years old at the time of the crimes. Like defendant, Profit was a member of the Mead Valley Gangster Crips. Profit testified he had been smoking marijuana with defendant one or two days after the crimes, when defendant told Profit he "messed up" and confessed to shooting Robert and Monique. Defendant said he shot Robert in the head because he "had to get paid" and shot Monique because he "didn't want no witnesses." Defendant and his cohorts then searched the house for drugs. Profit claimed defendant had told him

5

he had taken eight ounces of "dope" from Robert. Profit later stated he had seen defendant with this quantity of drugs some two weeks before the shooting.

Two expert witnesses testified regarding the likely manner in which Monique had been killed. Dr. Joseph Choi, a forensic pathologist who performed the autopsy, testified the gun had likely been between two and four inches from her face when she was shot. In his opinion, Monique's injuries indicated she had been lying facedown on the floor while the shooter stood over her, lifted her head by the hair, and shot her in the left cheek. Elissa Mayo, a senior criminalist with the California Department of Justice, analyzed the blood spatter at the crime scene. Based on that analysis, Mayo estimated that Monique's head was no higher than two feet above the floor when she was shot.

### 2. *The Defense Case*

The defense rested without introducing any evidence.

### B. The Penalty Phase

After convicting defendant of the charged crimes, the jury was unable to reach a penalty verdict. The following evidence was presented at the penalty retrial.

### 1. *The Prosecution Case*

The prosecution introduced evidence of the circumstances of the crime. As he did in the guilt phase, Kevin Jackson recounted the story defendant had told him shortly after the shooting. Testimonial evidence and an autopsy photograph established that Monique was one month pregnant when she was murdered.

Evidence concerning the circumstances of defendant's prior convictions also was presented. Joseph Canada testified that in July 1991, he had pulled his car off to the side of the road to eat his lunch and then dozed off. When Canada awoke, he saw defendant, who appeared to be 16 years old, pointing a shotgun

6

directly at Canada's face from two to three feet away. Three other teenage males were pointing shotguns at Canada from a Jeep Cherokee parked approximately 10 to 15 feet away. Defendant demanded Canada's wallet and keys and told him to lie facedown in the dirt. Canada thought he was going to die, but the teens drove off, taking Canada's car along with the Jeep. Once they had gone, Canada rushed to a nearby house and called 911. Defendant and his accomplices were soon spotted and led the police on a chase. They eventually surrendered after a two-hour standoff. The incident continued to affect Canada years afterward.

In July 1992, defendant and his cousin, Derrick Palmer, committed an armed robbery of a drug store. While Palmer disarmed the store's owner and took cash out of the register, defendant approached two store employees. One of these employees, Kenny Johnson, testified that defendant pointed a loaded gun at his face. Defendant then put his knee in Johnson's back and jammed the gun into his neck so hard that it caused a blood clot. Defendant asked where the store cameras were, and Johnson replied there were no cameras. Defendant told Johnson: "When I count to three, if you don't tell me, you're dead." Defendant counted to two, then ran away. Both Palmer and defendant were arrested after their mothers turned them in to the police.

In September 1994, two police officers stopped a car in which defendant was riding in the front passenger seat. When defendant exited the car, the officers discovered a loaded handgun on his seat. Defendant was arrested for being a felon in possession of a loaded firearm.

The prosecution also introduced evidence of the following altercations involving defendant while he was in jail or prison. In June 1995, James Ghan was a correctional officer at Mule Creek State Prison (Mule Creek), where there was tension between inmates in the Crips gang and inmates in the 415 gang. Ghan witnessed a group of six to eight 415 inmates rush across the prison yard to attack

7

two or three Crips inmates. Other Crips ran to join the fray. Eventually as many as 18 people were involved in the brawl, which ended shortly after Ghan shot a 415 inmate who was kicking a Crips inmate in the head. Defendant was later identified as one of the Crips who participated in the brawl, although his role in the fight was unclear.

Correctional Sergeant Vern Nichols testified that in August 1995, defendant and two other Mule Creek inmates refused an officer's order to "get down" after a fight had broken out between two inmates elsewhere in the prison. One of the three inmates told the officer, "Fuck you. We don't have to get down," but Nichols was not sure whether it had been defendant.

In November 1995, Correctional Officer Floyd Haynes had seen defendant and another Mule Creek inmate fighting in the basketball court area of the prison yard. Haynes yelled at them to stop fighting and get down on the ground, which they did. Haynes was not sure what had prompted the fight.

William Rose, a correctional deputy with the Riverside County Sheriff's Department, testified about an incident that occurred when defendant was being held in the Southwest Detention Center. On one occasion in September 1996, defendant had refused an order to respond to the guards who were conducting a head count. When defendant subsequently stepped out of his cell and was handcuffed, he used profanity and challenged the guards to a fight.

In June 1997, Correctional Officer Jerry Baker broke up an altercation between defendant and inmate Robert Mayo in defendant's cell at the Robert Presley Detention Center. Mayo claimed that he had gone into defendant's cell after the two argued while playing basketball, and that defendant had "sucker-punched" him in the back of the head.

8

With respect to victim impact testimony, Monique Cleveland's cousin, Jeannette Burns, described Monique's life and the impact of her death on their family.

### 2. *The Defense Case*

Four family members appeared on defendant's behalf. Defendant's maternal grandparents each testified that defendant's father had little or no role in raising his son. Defendant's grandfather also claimed that defendant, after getting out of prison, injured his head in a motorcycle accident and did not seem to be the same person afterward.

Defendant's older brother, Antione Jackson (Antione), described in detail the circumstances of defendant's upbringing. When Antione was five and defendant was four, their mother had moved in with a man named Alonzo. Antione described the year during which they lived with Alonzo as "torture." Antione and defendant saw Alonzo beat their mother many times. Defendant tried to defend his mother, but Alonzo would throw him across the room. Antione also recalled numerous times when he, defendant, and their mother were forced to accompany Alonzo on trips to steal cars. A short time after their mother moved them out of Alonzo's house, Alonzo came to their grandmother's home with his "flesh burning," like he was "melting." Alonzo eventually died from his burns.

After Alonzo was out of the picture, Antione and defendant were exposed to a great deal of violence. Their mother became abusive. She also moved them back and forth between neighborhoods affiliated with either the Crips or the Bloods, and children associated with the gangs often attacked them or challenged them to fights. Antione recounted his own early involvement in gangs and crimes, his extrication from his gang affiliations, and his later service in the army.

9

Defendant's mother, Paula Rice, confirmed and expanded on much of the testimony by her parents and Antione. Defendant's biological father had become a drug addict soon after defendant's birth and had never been a part of his life. Rice spoke of the daily physical abuse she endured from Alonzo, which was regularly witnessed by, and sometimes involved, defendant. She also described the incredible lengths to which Alonzo would go to keep her under his control, and said he raped her in front of defendant on multiple occasions. Rice was able to move her family out of Alonzo's house only after she responded to one of his regular beatings by stabbing him with a pair of scissors. Their relationship ended a few months later when he died from his burn injuries.

Subsequently, Rice regularly moved the family between gang-affiliated neighborhoods, which often resulted in her two sons being attacked. Rice also described her involvement in another abusive relationship when defendant was approximately 13 years old, and defendant's attempts to physically defend her on multiple occasions.

## II. DISCUSSION

### A. Use of Stun Belt at Trial

Defendant contends the trial court's orders requiring him to wear a REACT[3] stun belt during his trial were an abuse of discretion and violated his constitutional rights to due process, effective assistance of counsel, and a reliable penalty phase trial. These alleged errors and constitutional violations, he claims, require reversal of his convictions and death judgment.

---

[3] "REACT" stands for "Remote Electronically Activated Control Technology." (*People v. Mar* (2002) 28 Cal.4th 1201, 1214 (*Mar*).)

### 1. Governing Legal Principles

A trial court " 'has broad power to maintain courtroom security and orderly proceedings.' [Citation.] On appeal, its decisions on these matters are reviewed for abuse of discretion." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1270 (*Virgil*).) In *People v. Duran* (1976) 16 Cal.3d 282 (*Duran*), a case involving visible shackling, we held that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a *manifest need* for such restraints." (*Id*. at pp. 290-291, italics added.) Federal law is in accord. (See *Deck v. Missouri* (2005) 544 U.S. 622, 624 [federal Constitution "forbids the use of visible shackles . . . *unless* that use is 'justified by an essential state interest' . . . specific to the defendant on trial"].)

In *Mar*, *supra*, 28 Cal.4th 1201, we extended *Duran*'s "manifest need" standard to use of visible and nonvisible electronic stun belts. (*Mar*, at pp. 1218-1220; see *Virgil*, *supra*, 51 Cal.4th at p. 1270.) In deciding whether use of a stun belt is justified, " 'the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citation.] Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.]" (*Virgil*, at pp. 1270-1271.)

Even though *Mar* was the first California opinion to hold *Duran*'s manifest need standard applicable to stun belts, we have applied the standard to cases tried before *Mar* was decided. (E.g., *Virgil*, *supra*, 51 Cal.4th at pp. 1269-1271; *People v. Lomax* (2010) 49 Cal.4th 530, 558-562; *People v. Gamache* (2010) 48 Cal.4th 347, 366-370; *Mar*, *supra*, 28 Cal.4th at pp. 1222-1223.) However, in cases where

the trial predated *Mar*, we have not faulted the courts for failing to consider the potential physical harm and psychological impact of stun belts as part of the manifest need determination. (*Virgil*, *supra*, 51 Cal.4th at p. 1271 [observing *Mar* discussed these points to provide guidance in future trials]; *Lomax*, at p. 562; *Gamache*, at p. 367, fn. 7; *Mar*, at pp. 1225-1230.)

As we have explained, the unjustified use of a stun belt may adversely affect the fairness of a trial or the reliability of a judgment in various ways. Like shackles that are visible to the jury, visible stun belts "may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community." (*People v. Hernandez* (2011) 51 Cal.4th 733, 742; see *Duran*, *supra*, 16 Cal.3d at p. 290 [visible shackling will likely lead jurors to infer the defendant is a violent person].) Moreover, as in cases of forced shackling, the forced wearing of a stun belt may discourage the defendant from taking the stand, or may impair the defendant's credibility if he or she decides to testify. (*Mar*, *supra*, 28 Cal.4th at pp. 1224-1225; *Duran*, at p. 296.) Additionally, "requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may impair a defendant's capacity to concentrate on the events of the trial, interfere with the defendant's ability to assist his or her counsel, and adversely affect his or her demeanor in the presence of the jury." (*Mar*, at p. 1205.)[4]

In *Duran*, *supra*, 16 Cal.3d 282, and *Mar*, *supra*, 28 Cal.4th 1201, the respective trial courts failed to require a showing of manifest need before ordering

---

**4**     Hence, while courts in trials predating *Mar*, *supra*, 28 Cal.4th 1201, were under no obligation to consider the potential psychological consequences before issuing a stun belt order (*id*. at p. 1225, fn. 7), our prejudice analysis requires that we review the record for evidence that the unjustified use of a stun belt resulted in mental anxiety or distress that impaired the defendant's right to a fair trial.

the defendants to wear restraints while testifying. In *Duran*, we found it significant that, due to the erroneous order, the defendant was forced to wear visible wrist and ankle restraints while exercising his right to testify. (*Duran*, at p. 296.) We also determined the defendant should have been "afforded a proper and full opportunity to cross-examine" a critical witness and was "denied a proper and full opportunity to explain why he fled" from the crime scene. (*Id*. at pp. 295-296.) Observing that the evidence inculpating the defendant did not compel a guilty verdict, and that the visible shackling damaged the defendant's credibility in the eyes of the jury, we concluded the compounded effect of these errors required reversal of the judgment under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Duran*, at pp. 295-296.)

In *Mar*, the defendant was forced to wear a stun belt that was not visible to the jury. The defendant, however, had "clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript confirm[ed] that defendant was nervous while testifying at trial." (*Mar*, *supra*, 28 Cal.4th at p. 1224.) "Moreover, defense counsel specifically noted that defendant was 'afraid that somebody's going to push the button,' and in light of the circumstances that defendant was on trial for having caused an injury to a law enforcement officer and that the activation of the stun belt was to be controlled by another law enforcement officer, defendant's expressed anxiety in this regard, even if not justified, [was] plausible." (*Id*. at pp. 1224-1225.) Because of "the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying," we concluded the error was prejudicial, even under the *Watson* standard. (*Id*. at p. 1225.) Thus, in both *Duran* and *Mar*, the respective records disclosed that the

13

unjustified use of shackling and a stun belt had adverse effects that were not harmless.

In contrast to the situations presented in *Duran* and *Mar*, reversal of a judgment is unwarranted when the record on appeal is devoid of evidence that the unjustified use of shackles or a stun belt had any adverse effect. For instance, while restraints have the potential to bias jurors against the defendant (*People v. Hernandez*, *supra*, 51 Cal.4th at p. 742; *Duran*, *supra*, 16 Cal.3d at p. 290), their use may be harmless when there is no indication the jurors saw the restraints. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 85 (*Manibusan*) [finding of harmlessness based in part on circumstance that "[n]othing in the record suggests that any juror saw the belt"]; *People v. Foster* (2010) 50 Cal.4th 1301, 1322; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 155 (*Letner*) ["we do not presume the prospective jurors viewed the restraint, and there is no evidence in the record demonstrating they did observe it"]; accord, *United States v. McKissick* (10th Cir. 2000) 204 F.3d 1282, 1299 [refusing to presume prejudice where no evidence in record that any juror noticed the stun belt].)

Likewise, while restraints can impair a defendant's ability to testify effectively (*Duran*, *supra*, 16 Cal.3d at p. 296), their use may be harmless when the defendant chose not to testify at trial, and there is nothing in the record suggesting a nexus between that decision and the forced wearing of the restraint. (*Virgil*, *supra*, 51 Cal.4th at p. 1271; see *People v. Combs* (2004) 34 Cal.4th 821, 838-839; *People v. Anderson* (2001) 25 Cal.4th 543, 596; *People v. Cox* (1991) 53 Cal.3d 618, 652.)

Finally, while shackles and stun belts certainly "have the potential to impair an accused's ability to communicate with counsel or participate in the defense," the erroneous imposition of those restraints may be harmless where the record "does not reveal that any such impairment occurred." (*People v. Ervine* (2009)

14

47 Cal.4th 745, 773-774 [shackling]; see *Manibusan*, *supra*, 58 Cal.4th at pp. 85-86 [stun belt]; *People v. Howard* (2010) 51 Cal.4th 15, 30 [stun belt] (*Howard*); *Letner*, *supra*, 50 Cal.4th at p. 156 ["no evidence in the record demonstrating that [the defendant's] ability to participate was affected in any manner by his wearing the leg brace"]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1051 (*Wallace*) [no evidence that shackling caused defendant to suffer from mental impairment, physical pain, or obstruction of communication with counsel, or that it influenced his decisions regarding testifying]; *People v. Combs*, *supra*, 34 Cal.4th at p. 839 [noting no evidence or claim that the defendant's leg restraints influenced him not to testify, or that the restraints "distracted him or affected his demeanor before the jury"]; accord, *Weaver v. State* (Fla. 2004) 894 So.2d 178, 196; *Stanford v. State* (Ga. 2000) 528 S.E.2d 246, 249-250; *State v. Odenbaugh* (La. 2011) 82 So.3d 215, 257-258; *State v. Johnson* (Ohio 2006) 858 N.E.2d 1144, 1179-1180.)[5]

---

[5]  In *People v. Hill* (1998) 17 Cal.4th 800, we reversed a death judgment based in part on the trial court's failure to independently assess whether the defendant posed a sufficient danger of escape to warrant shackling before the jury. (*Id*. at p. 846.)  There, we did not review the record for evidence that the shackling — which was not visible to the jury — adversely affected the defendant's mental state, but simply noted the "possibilities of prejudice." (*Ibid*.)  Significantly, however, that defendant's trial was rife with numerous other serious errors, including constant and outrageous prosecutorial misconduct; the court's failure to excuse a bailiff from further courtroom duties after he testified against the defendant; the court's failure to instruct the jury regarding the bailiff's testimony; and instructional error under *Carlos v. Superior Court* (1983) 35 Cal.3d 131. (*Hill*, at pp. 844-847.)  Considered together, the prosecutorial misconduct and trial court errors "created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*Id*. at p. 847.)  Because the circumstances in *Hill* were extraordinary, we do not view its shackling discussion as casting doubt on the prejudice analysis of the numerous other authorities cited above.

*2. Analysis*

We turn to the facts in this case. Prior to defendant's trial, which preceded *Mar*, *supra*, 28 Cal.4th 1201, defendant objected to being physically restrained and shackled during any of the court proceedings against him. At the time, the only published authority addressing a trial court's discretion to order a defendant to wear a REACT stun belt was *People v. Garcia* (1997) 56 Cal.App.4th 1349 (*Garcia*), which concluded that, unlike shackling, a stun belt was not a physical restraint requiring an on-the-record showing and finding of manifest need. (*Id*. at pp. 1355-1356 & fn. 1.) In light of *Garcia*, the prosecution responded to defendant's objections with a request that defendant be required to wear a stun belt throughout the trial, or in the alternative, that defendant be given the option of wearing shackles instead. The prosecution supported its stun belt request by pointing to the allegations of the charged crimes and the incidents described in the statement of aggravation.

Based on a deputy's assurance that having two deputies in the courtroom during defendant's trial would provide adequate security, the court declined to order shackling and determined that a stun belt would not be necessary. The court ultimately required use of a stun belt after the sheriff's department could not guarantee the presence of two deputies unless a belt were ordered.

When defendant first wore the belt in the courtroom, the court noted the belt had "a special safety guard" and stated that if problems were to "arise with comfort, or so forth," defendant should "just let the deputies know at breaks. We will make him as comfortable as possible." Defense counsel immediately stated the belt was uncomfortable for defendant and did not allow him to lean back in his chair, so the attending deputy worked to adjust the belt. Because the deputy thought defendant was concerned that leaning back would activate the belt, he assured defendant and the court that that would not happen. After the belt was

16

adjusted and defendant was given a pillow, defendant said, "That's a little better." Later that day, defense counsel reported to the court that defendant was "indicating for just this afternoon" that he was very uncomfortable because the belt seemed tighter than before. The court ordered the attending deputy to do whatever he could to make defendant comfortable, and the deputy agreed. When the court acknowledged during this exchange that "sitting backwards with the box at the hip . . . certainly can be uncomfortable," defense counsel stated, "Judge, just so we're clear, I think we resolved that problem. I think he's just got it on too tight today." After the belt was readjusted, the defense reported no additional complaints or concerns about the stun belt at the guilt phase or the first penalty trial.[6]

After the first jury could not reach a penalty verdict, a different judge was assigned to preside over the penalty retrial. The prosecution again requested use of a stun belt, and defense counsel objected on two grounds. First, counsel argued the belt was unnecessary because defendant had not done "anything in the past to exhibit any kind of unruly behavior or any disrespect to the Court or any staff." Second, the belt was uncomfortable for defendant, and counsel was "worried about any unconscious grimacing or exhibitions of discomfort that [defendant] might make that might be misconstrued by the jury as a reaction to witness testimony or anything like that." When counsel asked the court to instead consider ordering a leg brace, the court expressed its belief that shackling was "most

_____

[6] The only other mention of the stun belt during the first trial occurred when the court and counsel addressed the security plans to be used when Robert Cleveland, who allegedly harbored "very ill feelings" toward defendant for "shooting him in the face and killing his wife," was to take the stand. A deputy explained that the plan was to have three deputies in the courtroom, one of whom, as usual, would be monitoring the REACT stun belt.

17

offensive." Upon determining that a leg brace would not sufficiently address its concerns "about the violent nature of [defendant's] responses to people in authority," the court approved use of a stun belt and ordered a pillow to alleviate defendant's discomfort.

Defendant first contends the trial court abused its discretion in forcing him to wear the belt during *the guilt phase* because: (1) having determined the belt would not be necessary if two deputies were available, the court should have ordered the sheriff's department to provide two deputies instead of deferring to the department's policy of not providing a second deputy unless a belt were ordered (see *Mar*, *supra*, 28 Cal.4th at p. 1218 [trial court must make its own determination of the manifest need for restraints and may not "abdicate[] this decision-making authority to security personnel or law enforcement"]); and (2) the court required use of the belt despite the absence of any on-the-record showing of nonconforming conduct by defendant (see *id*. at pp. 1220-1221).[7]

Defendant further contends the trial court abused its discretion in ordering a stun belt for *the penalty retrial* because: (1) as before, there was no on-the-record showing of nonconforming conduct by defendant, and the court instead relied on unsworn out-of-court statements of an unidentified bailiff in concluding the belt was necessary (see *Mar*, *supra*, 28 Cal.4th at pp. 1220-1221); (2) the court failed

---

[7] Relying on *Mar*, *supra*, 28 Cal.4th 1201, defendant also complains the trial court erroneously failed to make any inquiry into potential psychological consequences and physical effects in the event he were restrained with a stun belt. As discussed, however, *Mar* made clear its discussion regarding these inquiries was offered to provide guidance for *future* trials. (*Id*. at pp. 1225-1226, 1230.) Because defendant's trial preceded the *Mar* decision by several years, the trial court was not required to foresee and discuss such concerns before issuing its order. (*Virgil*, *supra*, 51 Cal.4th at p. 1271; *People v. Gamache*, *supra*, 48 Cal.4th at p. 367, fn. 7.)

to consider defendant's three-year record of courtroom cooperation; and (3) the court failed to consider less drastic alternatives to the stun belt, such as additional deputy presence in the courtroom (see *id.* at p. 1206 ["court should impose the least restrictive measure that will satisfy the court's legitimate security concerns"]).

In light of the People's concession at oral argument that the trial court erred under *Mar*, *supra*, 28 Cal.4th 1201, we proceed directly to the issue of prejudice. As we shall explain, the record affirmatively dispels any notion of prejudice, leaving no reasonable possibility that defendant would have received a more favorable verdict had the trial court not required him to wear a stun belt. (*People v. Brown* (1988) 46 Cal.3d 432, 446-448 (*Brown*).)[8]

First, there is no evidence in the record that the jurors saw the stun belt at any time. Thus, there is no basis for finding that visibility of the belt may have biased the jurors' perception of his character. (See *People v. Foster*, *supra*, 50 Cal.4th at p. 1322; *Letner*, *supra*, 50 Cal.4th at p. 155.) Second, defendant chose not to take the stand, and the record contains no suggestion the forced wearing of the belt played any role in that decision so as to inhibit his defense. (See *Wallace*, *supra*, 44 Cal.4th at p. 1051; *People v. Cox*, *supra*, 53 Cal.3d at p. 652.)

We next assess whether the stun belt had any other adverse effect on defendant. During the first trial, the only time defendant voiced complaints about the belt's effects was on the first day he wore it. In the morning, he complained the belt was uncomfortable and would not allow him to lean back in his chair. In response, the court had the belt adjusted, offered defendant a different chair

---

[8] We employ the test applicable to state law error at the penalty phase of a capital trial, because defendant claims the court's ruling affected both the guilt and penalty phases.

19

(which he declined), and provided him a pillow. That afternoon, defendant again indicated discomfort because of the stun belt. At that point, defense counsel clarified that defendant's earlier difficulty with leaning back had been "resolved," and that the issue that afternoon pertained merely to the belt's feeling tighter to defendant than before. The stun belt was readjusted, and the defense reported no additional complaints or concerns about the belt through the conclusion of the first trial.

At a hearing before the penalty retrial commenced, defense counsel expressed worry to the trial court that the stun belt might cause defendant to unconsciously grimace or exhibit discomfort that might be misconstrued by the jury as a reaction to witness testimony. As in the first trial, the court ordered defendant to wear the belt but made sure a pillow was provided to address the discomfort issue. The retrial proceeded to its conclusion without any defense claim or assertion that the stun belt was affecting defendant's demeanor.

We observe that, at the outset of the first trial, the attending deputy said he thought defendant might be concerned that leaning back would activate the stun belt. Although the defense offered no indication that defendant actually had this worry, the deputy assured defendant and the court that leaning back would not activate the belt. Throughout the duration of both trials, the defense never once stated or suggested that the threat of electric shock affected defendant's mental state or that the belt caused him to experience mental stress or impairment.

Justice Liu evidently agrees that the stun belt was not visible to the jurors, that it did not affect defendant's decision not to testify, that it did not inhibit defendant's ability to confer with counsel, and that it was not prejudicial at the guilt phase. Nonetheless, Justice Liu identifies two incidents as supporting his notion that the belt may have impaired defendant's ability to maintain a positive demeanor before the jury at the penalty retrial. First, he contends the penalty

20

retrial court made a remark that defendant "could have reasonably interpreted . . . as a warning that the bailiff would activate the stun belt if defendant were to engage in any further verbal or nonverbal communication with his family." (Conc. & dis. opn. of Liu, J., *post*, at p. 32.)  This, however, is pure conjecture. The record contains no indication that defendant construed the court's remark in the manner suggested.  The defense made no claim or objection that the remark had any effect on defendant's demeanor or mental state, and this despite the fact that defense counsel readily complained when the belt was too tight or made it difficult for defendant to lean back.  Even defendant's appellate briefing makes no mention of the remark.

Second, Justice Liu notes that, at the first penalty trial, the defense moved to preclude the prosecution from commenting on defendant's in-court demeanor, and the trial court agreed that, up to that point, " 'the only real issue is lack of emotion.' "  (Conc. & dis. opn. of Liu, J., *post*, at p. 31.)  Although Justice Liu surmises that this exchange pertained to the stun belt's effects, the defense offered no indication at trial that its motion had anything to do with the belt; likewise, defendant's appellate briefing makes no reference to the exchange.  The transcript of the proceedings, read in context, shows that the exchange occurred while the prosecution was still presenting its case in aggravation, so it is hardly surprising that defendant may have sat impassively while testimony of the prosecution's witnesses was being taken.  Moreover, the thrust of the defense's motion was that there was no foundation for negative prosecutorial comment on defendant's demeanor or supposed lack of remorse, because there was no evidence of defendant's acting out or inability to control himself in court.  As indicated by its comment, the trial court agreed.

Neither of these incidents supports Justice Liu's speculation that the stun belt may have caused defendant to exhibit any observable behavior that would

21

have detracted from his defense. In fact, the record is to the contrary, affirmatively demonstrating the assessment of defense counsel that the jurors' consideration of defendant's courtroom demeanor would have a *favorable* effect on their penalty determination. Specifically, at each of the penalty trials counsel urged the court to give two special instructions that would have told the jurors their in-court observations of defendant could be considered in mitigation. When the court expressed skepticism about giving these instructions at the first penalty trial, defense counsel held fast and countered that case law permitted the jurors "to draw a humane perception of the defendant by his conduct, the way he looked." Although the defense's special instructions were refused at both penalty trials, the only reasonable inference that can be drawn from counsel's vigorous efforts on this point is that the stun belt did not have the prejudicial effect urged by Justice Liu.

*Howard*, *supra*, 51 Cal.4th 15, is instructive under these circumstances. In *Howard*, the defendant claimed the trial court erred and violated his constitutional rights by requiring him to wear a stun belt without making the requisite finding of manifest need. Although we agreed the court's order was error, we found it was not prejudicial even assuming application of the "reasonable doubt" harmless error test of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Howard*, at p. 30.) There the record showed the defendant had made an extended statement to the court at sentencing that antipsychotic medication affected his mental state during trial. (*Id*. at p. 29.) Significantly, however, the defendant "made no reference to a stun belt or its effects on his demeanor." (*Ibid*.) Therefore, we concluded, wearing the stun belt had "no appreciable effect on him, even by his own account" (*id*. at p. 30), and "the record affirmatively dispels any notion that he was prejudiced" (*id*. at p. 28). (See also *Manibusan*, *supra*, 58 Cal.4th at p. 86 [defendant's psychological impact argument lacked any support in the record and

was inconsistent with his express agreement to wear stun belt and his failure to mention the issue in his new trial motion].)

A similar finding of harmlessness is warranted here. When defendant began wearing the stun belt, the trial court told the defense to let the deputies know if any problems were to arise with the belt. As the record reflects, defendant and his counsel identified only one complaint, namely, that the belt was uncomfortable to wear, either because it would not allow defendant to lean back in his chair or because it was too tight. A pillow was provided, and each time the defense spoke up, the court ordered adjustment of the belt in order to make defendant as comfortable as possible. Notably, the defense made no mention at either trial of the stun belt's potential or actual effects on defendant's mental state, and the record contains no hint that wearing the belt caused defendant to experience mental distress or that it inhibited his ability to confer with counsel and participate in his defense. Moreover, defendant's current claim of prejudicial psychological impact is inconsistent with his complete failure to mention the stun belt or its effects in any of his various motions for a mistrial, a new guilt trial, and a new penalty trial. (See *Manibusan*, *supra*, 58 Cal.4th at p. 86.) Finally, any contention that the belt may have caused defendant to exhibit a negative demeanor is highly dubious given defense counsel's on-the-record arguments that the jurors should be specially instructed that their in-court observations of defendant could be considered in mitigation.

Defendant claims his inability to turn around in his chair prevented him from seeing the prospective jurors at the penalty retrial and participating fully in the jury selection process. He also suggests his failure to face the prospective jurors may have alienated them. A fair reading of the reporter's transcript discloses, however, that the stun belt had nothing to do with the circumstance that defendant could not see or face the prospective jurors. Rather, as defense counsel

explained to the trial court, defendant had been specifically instructed to face forward at the counsel table and to not turn around at all, despite the unusual circumstance that the prospective jurors were all behind the counsel table. As soon as counsel brought this to the court's attention, defendant was allowed to move to the end of the table. Once there, defendant could see the prospective jurors while still facing forward as instructed, and the defense made no further complaints along this line.**9** Thus, any claimed interference and alienation during the jury selection process cannot be attributed to the stun belt.

In sum, there is no evidence that the stun belt was visible to the jurors or that it affected defendant's decision not to testify. Likewise, there is no indication the belt caused defendant mental anxiety or inhibited his ability to confer with counsel and participate in his defense. There is, however, evidence that defense counsel viewed defendant's demeanor as weighing in his favor during the penalty trial. Accordingly, the record affirmatively dispels any notion of prejudice, leaving no reasonable possibility that defendant would have received a more favorable verdict had the trial court not required him to wear a stun belt. (*Brown*, *supra*, 46 Cal.3d at pp. 446-448; see *Howard*, *supra*, 51 Cal.4th at p. 28; *id*. at p. 30; *Letner*, *supra*, 50 Cal.4th at p. 156; *People v. Ervine*, *supra*, 47 Cal.4th at

---

**9**     Defense counsel's statements were as follows: "Yesterday it came to my attention that [defendant's] instructions at counsel table are to face forward, not turn around at all. [¶] Because this is an unusual proceeding where we have all the jurors behind us, I'm asking for permission to let him turn and be able to look at the jury, because I realized yesterday that he hasn't seen any of these jurors. He's not able to participate fully in helping me select this jury. And plus I don't want to give the wrong impression to the jurors that he doesn't care and he's not going to turn around and be able to look them in the eye. So we have a conflict between . . . ." At that point the court suggested that defendant could sit at the end of the table, where he would be facing forward at all times. The deputy readily agreed, and we may infer that the issue was resolved to everyone's satisfaction.

24

pp. 773-774; *Wallace*, *supra*, 44 Cal.4th at p. 1051; *People v. Anderson*, *supra*, 25 Cal.4th at p. 596; *People v. Cox*, *supra*, 53 Cal.3d at pp. 650, 652 [no prejudice found even where defense counsel complained the handcuff used on defendant was "very uncomfortable"].)

Defendant, citing lower federal court decisions, argues the same error we recognized in *Mar*, *supra*, 28 Cal.4th 1201, violated his federal constitutional rights to due process, effective assistance of counsel, and a reliable penalty phase trial. However, neither we nor the United States Supreme Court has decided whether such state law error also implicates the federal Constitution. (See *Howard*, *supra*, 51 Cal.4th at p. 30; *Mar*, *supra*, 28 Cal.4th at p. 1225, fn. 7.) We need not decide the issue in this case. As this opinion explains, the record affirmatively dispels any inference of prejudice under *Brown*, *supra*, 46 Cal.3d 432. For the same reason, the People have satisfied their burden under *Chapman*, *supra*, 386 U.S. 18, to show that any federal errors are harmless beyond a reasonable doubt. (See *Howard*, at p. 30; see also *People v. Gonzalez* (2006) 38 Cal.4th 932, 961 [" '*Brown*'s "reasonable possibility" standard and *Chapman*'s "reasonable doubt" test . . . are the same in substance and effect.' "].) Finally, as defendant's counsel acknowledged at oral argument, we have held that a court's abuse of discretion in requiring use of a stun belt is not structural in nature and is not reversible per se. (*Howard*, at p. 30, fn. 6.)

## B. Guilt Phase Issue

### First Degree Murder Conviction and Robbery-Murder Special-Circumstance Finding

The murder count and the sole special circumstance allegation were tried on the theory that defendant killed Monique Cleveland while robbing or attempting to rob Robert Cleveland. (Former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A).) The prosecution's special circumstance verdict form, however,

25

specified robbery only, and omitted reference to attempted robbery.  The jury returned that form, which expressly stated that the murder was committed while defendant was engaged in the commission of a robbery.  Defendant claims the evidence fails to support the jury's robbery-murder special-circumstance finding, because there is no evidence that anything was actually taken from Robert.  Hence, he urges reversal of that finding, the first degree murder conviction, and the death judgment.

" 'On appeal, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [Citation.]  In conducting such a review, we " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" [Citations.]  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." [Citation.]  These same principles apply to review of the sufficiency of the evidence to support a special circumstance finding. [Citations.]' [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 849.)  The federal standard of review is in accord.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, relying on *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)

We assume for the purposes of argument that the evidence was insufficient to establish that either defendant or his accomplices actually took anything from the Cleveland house.  The prosecution, however, was under no obligation to prove that defendant had successfully completed a robbery, because both the first degree

26

felony-murder conviction and the special circumstance finding could properly be premised on a finding that defendant had *attempted* to rob Robert. (See § 189; former § 190.2, subd. (a)(17)(i), now § 190.2, subd. (a)(17)(A).)

As the record discloses, it was made abundantly clear to the jury that the prosecution need only prove the murder had occurred during an attempted robbery. The information, which was read to the jury, alleged that defendant had committed murder while engaged in the commission or attempted commission of the crime of robbery. The jury received instructions on the elements of robbery and the elements of attempt. As to the charge of murder, the court instructed that the prosecution must prove "a human being was killed; . . . the killing was unlawful; and . . . the killing occurred during the commission *or attempted commission* of a robbery." (Italics added.) The court further instructed: "The specific intent to commit a robbery and the commission *or attempted commission* of such crime must be proved beyond a reasonable doubt." (Italics added.) As for the special circumstance allegation, the jury was instructed to determine whether the murder "was committed while the defendant was engaged in the commission *or attempted commission* of a robbery," and was cautioned that the special circumstance is not established if "the robbery *or attempted commission* of a robbery was merely incidental to the commission of the murder." (Italics added.) Finally, the prosecution emphasized in closing argument that an attempted robbery was sufficient to support the charges against defendant. While conceding "at best it's murky whether they got dope or money from that house," the prosecution correctly explained "there is no necessity that property is actually taken."

Defendant acknowledges the evidence at trial was sufficient to prove Monique's murder occurred during the attempted commission of a robbery. But, he argues, the special verdict form shows the jury expressly found true only that the murder was committed while defendant "was engaged in the commission of

27

the crime of ROBBERY." Thus, he reasons, the felony-murder conviction and the robbery-murder special-circumstance finding are invalid because the evidence is insufficient to prove a completed robbery. This contention is meritless.

The verdict form's failure to reference an attempted commission of robbery did not serve to limit the charges against defendant. Nor did the jury's return of that form restrict its finding to one of a completed robbery. "A verdict should be read in light of the charging instrument and the plea entered by the defendant. . . . [T]he form of the verdict generally is immaterial, so long as the intention of the jury to convict clearly may be seen. [Citations.]" (*People v. Paul* (1998) 18 Cal.4th 698, 706-707; see also *People v. Jones* (1997) 58 Cal.App.4th 693, 710 [" ' "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." ' "].) As indicated, both the prosecution and the court told the jury to return the verdict form if it found true the robbery-murder special-circumstance allegation, and the court repeatedly instructed that the allegation could be found true if the prosecution proved the murder had been committed during the commission or attempted commission of a robbery. In returning the verdict form, the jury clearly manifested its intention to find true the allegation charged. That the form did not describe *all* of the circumstances under which the allegation could be proved is, under these circumstances, merely a technical defect that may be disregarded because " ' "the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice." ' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1259.)

Defendant's sufficiency of the evidence claim is rejected.

## C. Penalty Phase Issues

### 1. *Granting of Prosecution's Challenge for Cause*

At the penalty retrial, the trial court granted the prosecution's request to excuse Prospective Juror J.C. for cause.  Defendant contends this excusal violated the Sixth and Fourteenth Amendments to the federal Constitution under the standards established in *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*) and *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*).  This claim is without merit.

Prospective Juror J.C.'s questionnaire responses indicated she had never given "much consideration" to the death penalty, although she believed it was imposed too often "against African-American males."  During voir dire, J.C. further explained her views, stating:  "I wouldn't say I'd be the first one to jump up and say give him the death penalty, no.  You have to weigh options.  But I don't think I would be very likely to vote definitely for the death penalty."

K.M. was in the same group of prospective jurors and was questioned in front of J.C.  After ascertaining that gang members had recently killed K.M.'s cousin, the court asked if K.M. would "just keep flashing back to that situation" and whether that situation would "black out what you're hearing in this trial?"  K.M. responded, "It's too fresh right now."  Because K.M. might have difficulty sitting through the proceedings, the parties stipulated to his excusal.

The prosecution thereafter asked the group of prospective jurors whether any of them did "not feel that they could in fact be a person who could participate in a verdict that will result in the death of [defendant]," and Prospective Juror J.C. raised her hand.  When asked to explain her feelings about her ability to "be a juror in this case and to actually impose capital punishment," J.C. stated:  "I'm a widow.  I'm a recent widow.  17 months ago I buried my husband.  My husband

died in my arms.  I just can't deal with death that well.  No disrespect.  I don't want anything to do with this, sir."  The following exchange then occurred:

"[Prosecutor]: It would be a personal hardship for you?

"Prospective Juror [J.C.]: Very much so.

"[Prosecutor]: Like [Prospective Juror K.M.]?

"Prospective Juror [J.C.]: Very much so."

The prosecution later moved to dismiss Prospective Juror J.C. for cause. The defense submitted, and the court granted the motion.

"The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is ' "[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Uttecht v. Brown* (2007) 551 U.S. 1, 7, citing [*Witt*, *supra*,] 469 U.S. [at p.] 424.)" (*People v. Friend* (2009) 47 Cal.4th 1, 56.)  "When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 10.)

The voir dire of Prospective Juror J.C. amply supports the trial court's decision to excuse her.  Although initially she gave little indication that anything would prevent her from serving as a juror, she later stated, clearly and unequivocally, that she would be impaired.  J.C. raised her hand when asked whether anyone could not participate in a verdict sentencing defendant to death, and proclaimed she did not "want anything to do with this."  She also affirmed that her situation was similar to that of Prospective Juror K.M., who had indicated a recent tragedy would make him unable to listen to and weigh the evidence presented at trial.  J.C.'s voir dire responses furnished substantial evidence of her inability to perform her duties as a juror.

30

To the extent defendant claims the trial court erred because Prospective Juror J.C. appeared impaired by the recent death of her husband and not by her views about capital punishment, defendant misunderstands *Witt* and *Witherspoon*. Those decisions limit the extent to which jurors may be excused for cause because of their views on capital punishment, but they do not hold such views are the only grounds on which a challenge for cause may be granted. (See *Witt*, *supra*, 469 U.S. at pp. 421-424; *Witherspoon*, *supra*, 391 U.S. at pp. 522-523.) Whether J.C.'s expressed inability to perform the duties of a juror was due to the death of her husband, or was instead based on her general views about the death penalty, her responses affirmed she was unable to consider and render a death verdict if appropriate. The trial court did not err in excusing her for cause.

### 2. *Admission of Defendant's Postarrest Statement*

Over defendant's objection, the trial court allowed Los Angeles Police Officer Damon Aoki to give the following testimony at the penalty retrial. More than a month after the instant crimes, Officer Aoki approached defendant and several members of the 8 Trey gang who were drinking in public. Aoki took defendant into custody after he gave Aoki a false name. Although defendant gave another false name at the police station, a subsequent fingerprint check revealed defendant's true identity and also the arrest warrant for the murder. At some point, defendant, who was handcuffed, told Aoki that "if he had had a gun" when the officers had stopped him, "he would have had to shoot it out with [them] due to the fact that he had two strikes." Despite presenting this testimony to the jury, the prosecution made no mention of it during closing arguments.

Although the record is somewhat unclear, the trial court apparently concluded that defendant's statement that he would have shot the arresting officers had he had a gun was admissible to show defendant's lack of remorse about

31

Monique Cleveland's murder.  On appeal, defendant maintains such evidence was irrelevant and highly prejudicial because postcrime evidence of remorselessness does not fit within any statutory sentencing factors.  Thus, he claims, its admission violated both California law and his federal constitutional rights to due process, a fair trial, and a reliable penalty determination.

Although "[c]onduct or statements at the scene of the crime demonstrating lack of remorse may be consider[ed] in aggravation as a circumstance of the capital crime under section 190.3, factor (a)," " '*postcrime* evidence of remorselessness does not fit within any statutory sentencing factor.' " (*People v. Pollock* (2004) 32 Cal.4th 1153, 1184.)  Because such evidence is irrelevant to aggravation, it generally is inadmissible unless introduced to rebut evidence of remorse presented in mitigation.  (*Id.* at pp. 1184-1185).  Here, the People do not contend Officer Aoki's testimony was admissible to demonstrate a lack of remorse.

Instead, the People invoke the settled rule that " ' "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976; see also *People v. Brown* (2004) 33 Cal.4th 892, 901 ["If a judgment rests on admissible evidence it will not be reversed because the trial court admitted that evidence upon a different theory, a mistaken theory, or one not raised below."]  The People assert that, even if Officer Aoki's testimony was not admissible to show defendant's lack of remorse, it was properly admitted to show his consciousness of guilt.  Defendant counters that, given the events preceding his statements to Aoki and defendant's mention of his two strikes as the reason why he would want to shoot the arresting

officers, it is unreasonable to infer anything about defendant's supposed state of mind or his consciousness of guilt.[10]

Given the surrounding circumstances, including the fact that defendant falsely identified himself twice, a rational jury could view defendant's statement about shooting it out with the arresting officers as reflecting defendant's knowledge that he had committed two very serious crimes and his strong desire to evade capture. (See *People v. Russell* (2010) 50 Cal.4th 1228, 1253-1255 [defendant allegedly stated he would shoot the police if they came]; *People v. Dabb* (1948) 32 Cal.2d 491, 495, 500 [when stopped by police, defendant started shooting immediately].) Although the record does not disclose why defendant chose to verbalize his thoughts to Officer Aoki, the circumstance that defendant used the term "two strikes" does not extinguish its tendency to show consciousness of guilt of the two Cleveland shootings, particularly since defendant may not have known what information the police had at the time. Because evidence that a defendant committed the crimes charged is one of the most crucial "circumstances of the crime of which the defendant was convicted" (§ 190.3, factor (a)), admission of the challenged testimony was not error.[11]

---

[10] Defendant bases this contention on the following alleged circumstances: His statement was made more than a month after the Cleveland shootings; neither the statement itself nor anything leading up to it refers to those crimes; the statement was made after defendant had been arrested for drinking in public, not for murder; the statement was made before defendant was informed there was a murder warrant, and there was a different warrant out for his arrest at the time.

[11] Defendant's derivative constitutional claims based on the introduction of this evidence fail to compel a different result. (*People v. Lewis* (2008) 43 Cal.4th 415, 531.)

### 3. Admission of Evidence Concerning Victim's Pregnancy

Over defendant's objection, the trial court admitted testimony at the penalty retrial that Monique was approximately one month pregnant at the time of her death, as well as an autopsy photograph of the embryo. Defendant contends this was error because the evidence was irrelevant and unduly prejudicial. He further argues that admission of the evidence violated his rights under the Eighth and Fourteenth Amendments and their California counterparts. We are not persuaded.

"The Eighth Amendment to the federal Constitution permits the prosecution, in a capital case, to present evidence about the murder victim and the specific harm that the defendant caused as relevant to the jury's penalty decision. [Citations.] In California, the prosecution may introduce evidence of the specific harm caused by a defendant's crime at the penalty phase in aggravation as a circumstance of the crime (§ 190.3, factor (a)). [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 130-131 (*Jurado*).)

In *Jurado*, *supra*, 38 Cal.4th 72, we held that evidence of a murder victim's pregnancy was admissible in the capital defendant's penalty phase under section 190.3, factor (a). (*Jurado*, at pp. 130-131.) In so holding, we rejected the defendant's contention that the evidence was irrelevant and so unduly prejudicial as to require exclusion. As we explained, the circumstance that the defendant had ended "the life of a healthy 17-week-old fetus [the victim] was carrying was part of the harm caused by defendant's crime and thus was a legitimate, though emotional, consideration for the jury in making its penalty decision." (*Id.* at p. 131.) Under *Jurado*, the admissibility of such evidence does not turn on a defendant's knowledge of the pregnancy, because facts concerning the victim that are admissible as circumstances of the crime "are not limited to those known to or reasonably foreseeable by the defendant at the time of the murder." (*Ibid*.)

34

Consistent with *Jurado*'s analysis, we conclude the evidence of Monique's pregnancy was properly admitted as one of the circumstances of defendant's crime and, contrary to defendant's suggestion, the mere fact of her pregnancy was not so unduly prejudicial as to require exclusion.[12]  That defendant terminated the existence of the one-month-old embryo Monique was carrying was undeniably a harm resulting from defendant's crime and thus was a proper circumstance for the jury to weigh as part of its penalty deliberations.  (*Jurado*, *supra*, 38 Cal.4th at pp. 130-131.)

Defendant contends *Jurado*'s analysis is not controlling here, because there was no evidence that *anyone* knew of Monique's pregnancy.  We cannot agree that the relevance of Monique's pregnancy turns on whether it was known to anybody.  Rather, its relevance stems from the circumstance that termination of Monique's pregnancy was part of the specific harm caused by defendant's crime, as well as the circumstance that the victim's surviving family members will feel the impact of that crime, whether or not they knew of the pregnancy beforehand.  (See *Jurado*, *supra*, 38 Cal.4th at pp. 130-131.)

Defendant complains there was no showing that Monique's pregnancy was planned or wanted, or that her pregnancy would not have ended in a miscarriage or abortion.  No matter.  The evidence remained relevant and admissible without

---

**12**     Defendant points out the trial court described the pregnancy evidence as "highly prejudicial."  The court, however, was merely commenting that the evidence was highly adverse to defendant's case, a circumstance that would not preclude its admission.  (See *People v. Salcido* (2008) 44 Cal.4th 93, 148, and cases cited.)  Notably, the court overruled defendant's Evidence Code section 352 objection, specifically finding the pregnancy evidence would not create "a substantial danger of undue prejudice or confusing the issues or misleading the jury."

such showings, though defendant was free to argue these matters to the jury to lessen the impact of the aggravating evidence.

Defendant next argues the admission of the autopsy photograph of the embryo was erroneous and an abuse of discretion under Evidence Code section 352. We disagree.

"A trial court has broader discretion to admit photographic evidence of the crime at the penalty phase than at the guilt phase. 'This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences (§ 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present.' " (*People v. Mills* (2010) 48 Cal.4th 158, 205.) "The prosecution [is] entitled to have the penalty jury consider the real-life consequences of defendant's actions" and is not obliged to prove its case with " 'evidence solely from live witnesses.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 842.)

Here, the embryo photograph was sufficiently relevant to justify its admission. As defendant appears to acknowledge, there was no evidence that Monique was noticeably pregnant. But Dr. Choi, who conducted the autopsy, discovered an embryo about 10 millimeters in length (less than 0.4 inch) in the victim's uterus and determined she had been one month into a pregnancy at the time of her death. Thus, the photograph served to demonstrate the basis for Dr. Choi's opinion concerning Monique's pregnancy and constituted evidence of a specific harm caused by defendant, i.e., the termination of its existence. (See *Jurado*, *supra*, 38 Cal.4th at pp. 130-131.)

Moreover, we cannot say, either as a legal or a factual matter, that the photograph was inadmissible because it added nothing of substance to Dr. Choi's testimony. First, it is settled that prosecutors are not required to prove their cases with evidence solely from live witnesses (*People v. Solomon*, *supra*, 49 Cal.4th at

p. 842.) Second, and more to the point, the photograph had significant probative value in that it showed to the jury, more accurately than any testimony, the extent to which the embryo had begun to develop an identifiable head, spine, and extremities when its existence was extinguished. For some jurors, the photograph may have shown the embryo's physical development was greater than what they gleaned from Dr. Choi's testimony, while for other jurors, the extent of development may have been less than what they had expected. Thus, the photograph not only corroborated Dr. Choi's testimony, but it assisted each juror's understanding of it. (See *ibid.*) The prosecution was entitled to ask the jury to consider the photographic evidence of the embryo's development in weighing the harm caused by defendant and the loss to the victim's family.

Finally, the trial court did not abuse its discretion in determining the probative value of the photograph outweighed any prejudicial effect. (See Evid. Code, § 352.) The photograph, which we have reviewed, is neither gory nor particularly disturbing. Moreover, as displayed to the jury, it was "redacted" so as to show a tightly cropped picture of the embryo with minimal inclusion of the surrounding tissue. The image of the four-week-old embryo is nothing like those of fetuses at far more advanced stages of development, which in other jurisdictions were found to have been erroneously admitted. (E.g., *McCarty v. State* (Okla.Crim.App. 2002) 41 P.3d 981 [where issue was viability of a 24-week fetus, photo of the fetus extracted from its mother's body postmortem was misleading, highly inflammatory, and prejudicial]; *Erazo v. State* (Tex.Crim.App. 2004) 144 S.W.3d 487 [erroneous admission of photo of a 28-week fetus required reversal and remand for determination of harm]; *Rolle v. State* (Tex.App. 2012) 367 S.W.3d 746 [photo of a nearly six-month fetus erroneously admitted at guilt phase but found harmless].)

37

In sum, the photograph here was "neither unduly gruesome nor inflammatory," nor was it " 'of such a nature as to overcome the jury's rationality.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 650.) Accordingly, its admission at the penalty phase was not an abuse of discretion under Evidence Code section 352 and did not violate defendant's constitutional rights.[13]

### 4. *Admission of Autopsy Photograph of Monique Cleveland*

During the penalty retrial, the prosecution sought to introduce an autopsy photograph of Monique in which her eyes were open. The prosecution wanted to use this photograph to illustrate Dr. Choi's anticipated testimony that burn marks on one of Monique's eyeballs indicated her eyes had been open when she was shot. In admitting the photograph over defendant's objections, the court determined that the evidence was relevant to show Monique's awareness of "her impending death at the hands of the defendant" and that it would not create a substantial danger of undue prejudice.

That Monique's eyes were open at the time she was shot was a relevant circumstance of the crime (§ 190.3, factor (a)), and the photograph showing the burn marks on her eyeball assisted the jury in understanding Dr. Choi's testimony on the matter (see *People v. Solomon*, *supra*, 49 Cal.4th at p. 842; *People v.*

---

[13]    The prosecution referred to the embryo as a "baby" or an "unborn" child several times during its closing argument. Citing these instances, defendant argues the prosecution "powerfully used the already potent photographic evidence, on top of the highly prejudicial testimony about the pregnancy itself, to make an emotionally-charged appeal to the jurors that was certain to have an inflammatory impact." No basis for reversal appears. As discussed, Dr. Choi's testimony and the cropped embryo photograph were relevant to the jury's penalty decision and properly admitted. To the extent defendant asserts the prosecution's various arguments were inflammatory and inappropriate, his failures to object and request admonitions forfeit review of the contention on appeal. (*People v. Thomas* (2012) 54 Cal.4th 908, 943; *People v. Hamilton* (2009) 45 Cal.4th 863, 958.)

*Brasure* (2008) 42 Cal.4th 1037, 1054). The photograph was not unduly prejudicial simply because it demonstrated the manner in which defendant committed the crime. (See *Brasure*, at p. 1054.) Moreover, we have reviewed the photograph and find nothing especially gruesome or inflammatory about it. Accordingly, the court acted within its broad discretion in admitting the photograph, and defendant was not deprived of due process or a reliable capital sentencing determination. (See *id.* at pp. 1054-1055.)

### 5. *Admission of Victim Impact Evidence of Defendant's Prior Crimes*

Over defendant's objection, the trial court admitted victim impact evidence regarding defendant's prior armed robbery and carjacking of Joseph Canada and his armed robbery at a drugstore involving store clerk Daila Llamas. Both Canada and Llamas testified about the fear they felt during the robberies and its lasting effect. Defendant claims the court erred in admitting such testimony under section 190.3, factor (b) (factor (b)). Defendant is wrong.

Evidence is admissible under factor (b) when it shows that the defendant engaged in criminal activity that violated a penal statute and involved " 'the use or attempted use of force or violence or the express or implied threat to use force or violence' . . . directed at a person." (*People v. Thomas* (2011) 52 Cal.4th 336, 363.) It is settled that "the circumstances of the . . . violent criminal conduct, including its direct impact on the victim or victims of that conduct, are admissible under factor (b)." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 39; see *People v. Jones* (2012) 54 Cal.4th 1, 73 (*Jones*).) We decline defendant's request to reconsider our case law and conclude the challenged evidence was properly admitted. Having so concluded, we reject defendant's related claim that erroneous admission of the evidence contravened the Eighth Amendment. (See *Demetrulias*, at p. 40, fn. 15.)

## 6. Admission of Evidence of Prior Criminal Activity

As part of its case-in-chief, the prosecution introduced evidence of the following four instances of defendant's prior criminal activity under factor (b): (1) his September 1994 arrest for being a felon in possession of a firearm; (2) his November 1995 fight with an inmate near the prison basketball court; (3) his June 1995 participation in a gang-related prison melee; and (4) his involvement in an August 1995 incident in which he and two other inmates refused a prison guard's order to "get down." Defendant contends the admission of this evidence was error and violated his due process rights, because these incidents did not involve "the use or attempted use of force or violence or the express or implied threat to use force or violence." (Factor (b).)

The record is unclear, but it appears defendant may not have made these particular objections to the evidence of the first three incidents. In any event, evidence generally is admissible under factor (b) if it shows the defendant engaged in criminal activity that violated a penal statute and involved " 'the use or attempted use of force or violence or the express or implied threat to use force or violence' . . . directed at a person." (*People v. Thomas*, *supra*, 52 Cal.4th at p. 363.) The evidence must be sufficient to "allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt." (*People v. Griffin* (2004) 33 Cal.4th 536, 584.) For the reasons below, defendant's contentions as to all four incidents lack merit.

### (a) Defendant's Arrest for being a Felon in Possession of a Firearm

Although "[p]ossession of a firearm is not, in every circumstance, an act committed with actual or implied force or violence" such that it would be admissible under factor (b), "[t]he factual circumstances surrounding the possession . . . may indicate an implied threat of violence." (*People v. Bacon*

40

(2010) 50 Cal.4th 1082, 1127.) As the testimony of two officers indicated, such circumstances were present here. Defendant was found in possession of a handgun during a stop of an automobile whose occupants were believed to be involved in gang-related activity. Defendant's possession of this handgun was illegal because he was a convicted felon. When found on the seat where defendant had been sitting, the handgun was loaded with five rounds in the magazine and one in the chamber. On this record, "the jury legitimately could infer an implied threat of violence." (*People v. Dykes* (2009) 46 Cal.4th 731, 777 [evidence of firearm possession properly admitted where its possession without a permit was illegal, gun was loaded and ready to use, and the defendant had used similar firearm in committing offense for which he was then on trial].)

### (b) Defendant's Fight with an Inmate Near the Basketball Court

Although the guard who witnessed the fight testified he did not know whether defendant was the aggressor, neither side offered any evidence suggesting that defendant's participation in the fight was legally justified. " '[W]here the prosecution's evidence shows a jailhouse scuffle, the scene as witnessed does not suggest defendant may have been acting in self-defense, and defendant presents no evidence in mitigation, a finding of criminal assault is justified.' " (*People v. Moore* (2011) 51 Cal.4th 1104, 1136, quoting *People v. Lucky* (1988) 45 Cal.3d 259, 291.) Hence, the case law supports submission of this incident to the jury.

### (c) Defendant's Involvement in Prison Melee Between Rival Gangs

With regard to the gang-related prison melee, the evidence indicated defendant might have had a legal justification for any assault he committed, or perhaps not.

On the one hand, the evidence showed the fight began when members of the 415 gang ran across the yard toward certain members of the Crips gang, of

41

which defendant was a member. Given this evidence, defendant could plausibly claim he was acting in self-defense or in defense of another.

On the other hand, Officer Ghan, who witnessed the melee, testified that the day before there had been multiple fights between Crips members and 415 members. On the day of the melee, Officer Ghan knew there was "trouble brewing" based on his observation of the prisoners' "very unusual behavior" in the yard: Factions of both the Crips and the 415's were milling around back and forth, and all other prisoners had vacated the area between these two groups. This testimony gave rise to a reasonable inference that the fight between the Crips and the 415's had been prearranged, and that prisoners involved on both sides had engaged in " 'mutual combat' . . . pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045, italics omitted.) In this scenario, defendant's participation in the mutual combat "may preclude reliance on self-defense to defeat a charge of assault, or similar offense, unless [he] took specific steps to desist from the combat." (*Id.* at p. 1043, fn. 11; see also *People v. Lucky*, *supra*, 45 Cal.3d at p. 291 ["Voluntary mutual combat outside the rules of sport is a breach of the peace, mutual consent is no justification, and both participants are guilty of criminal assault."].) Thus, evidence of the incident was admissible, and it was for the jury to decide whether defendant's participation in the melee was legally justified or whether violent criminal activity had been proven.

Accordingly, with respect to the above three incidents, the evidence was sufficient to permit the jury to find the existence of prior criminal activity beyond a reasonable doubt. As to these three incidents, we reject defendant's claims of error and further reject his derivative constitutional claims. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1134.)

*(d) Defendant's Refusal to Obey Order*

The evidence showed that defendant and two other inmates had temporarily refused a prison guard's order to "get down," and that one of the three inmates had said, "Fuck you. We don't have to get down." Even assuming such evidence did not demonstrate criminal activity involving the use or attempted use of force or violence, or the express or implied threat to use force or violence directed at a person, any error in its consideration by the jury was undoubtedly harmless. The evidence was not especially prejudicial, particularly since the guard acknowledged that the three inmates were not a "direct threat" to him, and the prosecution made no mention of the incident in its closing argument. In any case, given the properly admitted evidence of defendant's cold-blooded murder of Monique and attempted murder of Robert, his prior armed robberies, and his violent and assaultive conduct in other prison incidents, there is no reasonable possibility that presentation of this nonviolent incident affected the verdict. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [nonviolent jail escape]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1169-1170 [threat to correctional officer]; *Brown*, *supra*, 46 Cal.3d at p. 449 [food riot, sexual misconduct, and possession of stolen wirecutters in jail].) Having rejected this state law claim, we likewise reject his derivative federal constitutional claims.

*7. Alleged Prosecutorial Misconduct During Penalty Retrial Voir Dire*

During voir dire of a panel that included three individuals who ultimately served as jurors, the prosecutor stated that defendant "sits here having been convicted of taking the life of another human being *himself*. That is a verdict that was rendered by a jury, and you must accept it as true." (Italics added.) On appeal, defendant claims the prosecutor committed misconduct by falsely stating he had been convicted of having *personally* taken the life of another human being,

43

when the prior jury's verdict need not have been premised on a conclusion that defendant was the one who killed Monique.

" ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of [the] defendant's claims are, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]' [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

Defendant unsuccessfully objected to the prosecutor's statement as "improper voir dire." The People, however, assert forfeiture of the claim because he failed to object on the precise ground asserted here.

Even assuming the claim had been preserved, we find no basis for reversal. While the prosecutor's brief comment was misleading as to the guilt findings, the question of defendant's precise role in Monique's murder was left for the penalty jury to decide. After both sides rested their cases, the trial court specifically instructed the jury to "determine what facts have been proved from the evidence received in the trial and not from any other source." The court emphasized to the

44

jury that it "must not be biased" against defendant because he had been convicted of this offense, and that such circumstance was not "evidence of what your verdict must be." The court also instructed that the attorneys' statements were not evidence.[14] Consistent with these instructions, the parties based their closing arguments entirely on the evidence presented, and as relevant here, focused on the strengths and weaknesses of the prosecution's theory that defendant personally shot and killed Monique. The defense urged the jury, without objection from the prosecution, to consider the concept of lingering doubt and to carefully scrutinize whether any physical evidence actually supported the prosecution's theory. Given these circumstances, there is no reason to think that the prosecutor's brief comment during voir dire would have affected the penalty deliberations of the three jurors who heard it. Thus, the challenged comment did not infect the trial with unfairness or mislead the jury as to its role in sentencing. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1205.) Nor is there a reasonable likelihood that the jury applied the remark in an improper or erroneous manner. (*Ibid.*)

Finally, defendant contends the challenged comment was part of a pattern of prosecutorial misconduct, citing six other incidents in which the prosecutor allegedly acted inappropriately. Defendant raises a separate challenge to one of these six incidents, which we discuss below. (See pt. II.C.8., *post* [examination of Kevin Jackson].) To the extent, however, that defendant challenges the remaining five incidents as additional examples of prosecutorial misconduct, he has forfeited review of each of these claims by his failures to object and request admonitions below. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1205.) In any event, none of the

---

[14]    We find no merit to defendant's contention that his inability to cross-examine the prosecutor about the challenged remark implicated his Sixth Amendment right to cross-examine the witnesses against him.

cited incidents related to the prior jury's findings, and none affects our conclusion that the prosecution's fleeting comment in voir dire did not deprive defendant of a fair trial.

### 8. Alleged Prosecutorial Misconduct During Examination of Kevin Jackson

During defense counsel's cross-examination of prosecution witness Kevin Jackson, counsel impeached Jackson with certain testimony he gave while being cross-examined previously during the guilt phase. Jackson responded: "I was allowing you to put words in my mouth then." When counsel asked if the district attorney had "put any words into your mouth," Jackson answered no.

On redirect examination, the prosecution asked Jackson whether he had spoken with defense counsel since testifying at the guilt phase. Jackson responded: "I talked to him I believe Saturday of this month." In response to further prosecutorial questioning, Jackson stated he felt defense counsel had tried to influence his testimony, but was not successful in doing so.[15]

On recross-examination, defense counsel asked Jackson: "What did I say to you to try to influence your testimony?" Jackson responded: "You asked me if — if I say anything nice about [defendant] would the D.A. pull back the deal that they have for me. And you asked me was there anything nice that I could say about [defendant]. You told me that — that [defendant's] co-defendant had

---

**15** The reporter's transcript reflects the following interchange between the prosecutor and Jackson: "[Question:] Did [defense counsel] say anything to you to try to influence your testimony here? [Answer:] He just asked me a few questions about testimony I give today. [Question:] I'm not asking you what he said. I'm just asking you if you felt he was trying to influence your testimony. [Answer:] Yeah. Yes. [Question:] Did he succeed in influencing your testimony? [Answer:] No."

confessed to the murder but the D.A. just wanted to put [defendant] away for murder."

In response to the prosecution's further redirect questioning, Jackson indicated defense counsel had told him that someone other than defendant had confessed to Monique's murder and that defendant was facing the death penalty. When asked if he thought counsel said such things to influence his testimony, Jackson answered in the affirmative.[16]

During the course of these exchanges, the defense registered no objection to any of the prosecution's questions. Subsequently, defense counsel moved for a mistrial, explaining, "[F]or the prosecutor . . . to put those kind of questions to Mr. Jackson in front of this jury and have him respond in a positive way I believe impugns my character, certainly is a cause for concern, or should be a cause of concern to [defendant] that this jury has now lost faith and credibility in me as his counsel." The court denied the mistrial motion, stating, "[I]t appears to the Court . . . that the character and credibility and ethicality of the defense counsel has not been impugned." The court, however, expressed its willingness, "in the event that [defense counsel] feels that his credibility is in any way impugned, for the Court to instruct the jury that the credibility . . . of counsel for either side is simply not in issue, that counsel have a duty to represent their respective positions to the best of their ability and in any manner ethically proper for them to do, that there has been, in the opinion of the Court, no indication of any improper tactic or activity on the

---

[16]    "[Question:] This defense attorney told you that someone other than [defendant] confessed to this murder? [Answer:] Yes. [Question:] Do you have any way of knowing if that's a lie? [Answer:] No. [Question:] Did you think that was intended to influence your testimony against [defendant]? [Answer:] Yes. [Question:] Did he also tell you that [defendant] was facing the death penalty in an effort to influence you against testifying here? [Answer:] Yes."

part of either counsel, and it shall not and must not enter into their deliberations . . . ." The defense declined the court's offer to give a curative instruction.

Defendant now claims the prosecution committed misconduct in eliciting testimony from Kevin Jackson regarding his meeting with defense counsel and in insinuating that counsel had lied during that meeting in order to get Jackson to change his testimony. Even were we to overlook defendant's failure to immediately object to the questioning as it was occurring, we will not disregard his refusal to accept the trial court's offer to admonish the jury.

Contrary to defendant's claim, a request for an admonishment would not have been futile because the trial court explicitly stated it was willing to give one. Moreover, we reject defendant's contention that the court's proposed admonition would have been ineffectual. At worst, the prosecution's questioning might have been understood to insinuate that defense counsel had lied to Jackson in an unethical effort to get him to slant his testimony in defendant's favor. The proposed admonition would have addressed that insinuation directly by instructing the jury that neither counsel had engaged in any improper tactic or activity and that neither counsel's credibility was at issue. Because such an admonition would have been more than sufficient to cure any possible harm caused by the prosecution's vague insinuation, defendant's refusal of the court's offer renders the claim of misconduct unreviewable. (*People v. Valdez* (2004) 32 Cal.4th 73, 124-125; see *People v. Linton*, *supra*, 56 Cal.4th at p. 1205.) For the same reasons, the trial court did not err in denying defendant's motion for a mistrial. (Cf. *People v. Collins* (2010) 49 Cal.4th 175, 198 [" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.' "].)

### 9. *Failure to Instruct on Meaning of "Personal Use" of a Firearm*

At the outset of the penalty retrial, the clerk read to the jury the verdicts previously returned by the jury during the guilt phase of the trial. Included among those verdicts was the jury's finding that defendant, "in the commission of the offense charged under Count I of the Information [first degree murder], did personally use a firearm, to wit, a handgun, within the meaning of Penal Code Sections 12022.5(a) and 1192.7(c)(8)." Defendant did not ask the court to further clarify the meaning of this or any other finding.

Defendant contends the trial court had a duty to instruct the penalty retrial jury, sua sponte, on the meaning of "personal use" of a firearm, as defined in CALJIC No. 17.19. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 773 ["Even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case."].) He claims the jury could have misconstrued the guilt phase jury's "personal use" finding as a specific determination that defendant had *fired* the handgun in the course of committing the murder, even though the finding could have been based on some other firearm use by defendant, such as his intentional display of a firearm in a menacing manner, or his intentional striking or hitting of a human being with it. (See CALJIC No. 17.19.) Because the previous jury may have found defendant guilty of murder and found true the robbery-murder special circumstance without necessarily finding he was the actual shooter, defendant contends a clarifying instruction was essential to a correct understanding of the personal use finding.

Defendant misinterprets our precedent regarding a trial court's sua sponte duty to instruct the jury on principles of law. Significantly, he fails to cite any authority requiring a court, at the penalty phase, to instruct sua sponte regarding a verdict or finding rendered at the guilt phase. Of course, a sua sponte duty to

49

instruct on particular principles of law may arise when the jury itself is called upon to apply those principles. (E.g., *People v. Breverman* (1998) 19 Cal.4th 142, 155-156 [lesser included offenses]; *People v. Prettyman* (1996) 14 Cal.4th 248, 266-267 [identification and description of uncharged target offenses under prosecution's theory of criminal liability].) But here, the jury's sole function at the penalty retrial was to decide whether defendant should be sentenced to death or to life imprisonment without possibility of parole, and its charge did not include making a personal use finding. Accordingly, instructions on the meaning of "personal use" of a firearm, as defined in CALJIC No. 17.19, were not necessary for the jury's understanding of the case.

This conclusion is consistent with the rule that applies when the prosecution offers evidence in aggravation of a defendant's violent criminal activity. "In that context, we have long held that '[a] trial court has no sua sponte duty to instruct on the elements of "other crimes" offered under section 190.3, factor (b).' [Citation.] Such instructions are 'not vital to a proper consideration of the evidence on the issue of penalty' [citation] because 'the ultimate question for the sentencer is simply whether the aggravating circumstances, as defined by California's death penalty law [citation], so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole' [citation]." (*People v. Cottone* (2013) 57 Cal.4th 269, 294.) As is often the case in that context, defense counsel here may reasonably have decided, for tactical reasons, against overloading the jury with instructions to illuminate the guilt phase verdict and findings, so that the jury might better focus on the central question of whether defendant deserved to live or die. (See *ibid.*)

To the extent defendant contends the trial court's failure to explain the meaning of the guilt phase jury's personal use finding was federal constitutional error, such claim also lacks merit. Contrary to defendant's suggestion, there is no

50

"reasonable likelihood" the penalty retrial jury understood the court's instructions (or lack thereof) "in a way that prevent[ed] the consideration of constitutionally relevant evidence" regarding the shooting of Monique Cleveland. (*Boyde v. California* (1990) 494 U.S. 370, 380.) As discussed more fully in part II.C.7, *ante*, no one argued or even suggested that the personal use finding constrained the jury's ability to consider the evidence presented at the penalty retrial. To the contrary, both the court and the parties emphasized to the jury that it must make its own determination, based on the evidence before it, as to whether defendant personally shot and killed Monique. (*Ibid.*)

For similar reasons, the court's failure to instruct on the meaning of the guilt phase jury's personal use finding did not violate due process or render the penalty retrial fundamentally unfair. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73.) Even assuming the jury understood the finding in the manner defendant suggests, defendant was not deprived of a fair proceeding. There is no reason to think the jury would have given this factor undue weight or any weight at all. As noted, the court instructed the jury to make its own determination of the facts and to not be biased against defendant because of his conviction. (See *ante*, at pt. II.C.7.) "We presume jurors 'generally understand and follow instructions.' " (*People v. Myles* (2012) 53 Cal.4th 1181, 1212.)[17]

---

[17] Although, as defendant observes, the prosecution did represent in its opening statement and closing argument that defendant was the one who shot Monique, it did so entirely on the basis of the evidence presented during the penalty retrial. The defense countered by poking holes in the prosecution's theory of the case, also based on the evidence before the jury. Given the court's instructions and the parties' respective arguments on the matter, there is no danger that the jury misunderstood its obligation to make its own evaluation of the facts or that the jury was unfairly influenced by any erroneous understanding of the previous jury's factual determinations.

51

## 10. *Alleged Instructional Error*

Defendant claims the trial court erred in refusing or failing to give a number of his specially tailored penalty phase instructions. As we have held repeatedly, "the CALJIC penalty phase instructions ' " 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' [Citation.]" ' " (*Jones*, *supra*, 54 Cal.4th at p. 74.) Defendant acknowledges our repeated rejection of claims nearly identical to those he presents here, but asks us to reconsider our prior holdings. We decline to do so.

Defendant first argues the trial court erred in refusing to instruct the jury that it must consider death to be a more serious penalty than a sentence of life in prison without the possibility of parole. We disagree. Pursuant to CALJIC No. 8.88, the jury was instructed: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." We "repeatedly have held that 'there is no legal requirement that penalty phase jurors be instructed that death is the greater punishment, because the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty. [Citations.]' [Citation.]" (*Jones*, *supra*, 54 Cal.4th at p. 81; see *People v. Thomas*, *supra*, 52 Cal.4th at pp. 361-362.)

Defendant next claims the trial court erred in refusing to instruct the jury that it "must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crimes for which the defendant had been convicted." "When requested, a trial court should provide such an instruction. [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 694.) But "CALJIC No. 8.85 does not inherently encourage the jury to 'double count' the same facts" (*McKinnon*, at

52

p. 695), and " 'the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor' " (*People v. Young* (2005) 34 Cal.4th 1149, 1225-1226). Here, the prosecution made no such misleading arguments. Therefore, we find " 'no reasonable likelihood that the jury unconstitutionally applied CALJIC No. 8.85.' [Citation.]" (*Jones*, *supra*, 54 Cal.4th at p. 77.)

Defendant also claims the trial court erred in refusing to give a proposed instruction informing the jury that its task at the penalty phase differed from that at the guilt phase, insofar as a penalty phase juror must render an "individualized, moral determination." Because this instruction was duplicative of other instructions given to the jurors — including instructions that they could consider "any sympathetic or other aspect of the defendant's character or record" (CALJIC No. 8.85) and were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider" (CALJIC No. 8.88) — the trial court did not err. (*Jones*, *supra*, 54 Cal.4th at pp. 74-75; see *People v. Butler* (2009) 46 Cal.4th 847, 874.)

Nor did the trial court err in refusing to give defendant's proposed instructions defining what sort of evidence could be considered as mitigation. The first proposed instruction listed evidence the defense had introduced and stated such evidence could be considered in mitigation. This instruction was properly denied. Although instructions pinpointing the defense's legal theories might be appropriate, a defendant is not entitled to instructions that simply highlight facts favorable to him. (See *People v. Cook* (2007) 40 Cal.4th 1334, 1364; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159.) The other proposed instructions — which emphasized the unlimited scope of the mitigating factors of which the jury could take account — "were duplicative of other instructions given, particularly

CALJIC Nos. 8.85, factor (k) and 8.88." (*Jones*, *supra*, 54 Cal.4th at p. 82.) The court did not err in declining to give them. (*Id.* at pp. 82-83; *Cook*, at p. 1364.)

Likewise, the trial court did not err in refusing to instruct the jury that it had the discretion to return a verdict of life without the possibility of parole regardless of the evidence presented at the penalty phase. As we have previously held, such an instruction is not required because CALJIC No. 8.88 adequately conveys this principle. (See *People v. McKinnon*, *supra*, 52 Cal.4th at pp. 695-696.) For the same reason, the court did not err in failing to instruct sua sponte that if the jury found that mitigation outweighed aggravation, it must return a verdict of life without the possibility of parole. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1211.)

The trial court also did not err in refusing to give defendant's proposed instruction defining the term "life without the possibility of parole." "[A] California penalty jury is instructed that one of the sentencing choices is 'life without parole,' and . . . this is a common phrase requiring no further definition." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 226.)

Nor did the court err in declining to give defendant's proposed instructions regarding the role that mercy could play in the jury's determination of defendant's sentence. As noted, the jury was instructed that it could consider as mitigating any "circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial" (CALJIC No. 8.85), and that it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider" (CALJIC No. 8.88). "We repeatedly have held that a trial court need not give a specific 'mercy instruction,' even if requested, when the above quoted

54

instructions are given [citation], and we reaffirm that conclusion here." (*People v. Hughes* (2002) 27 Cal.4th 287, 403.)

Finally, defendant claims the trial court erred in refusing to give his proposed instruction on lingering doubt. "Although it is proper for the jury to consider lingering doubt, there is no requirement, under federal or state law, that the jury specifically be instructed that it may do so, even if such an instruction is requested by the defendant." (*Jones*, *supra*, 54 Cal.4th at p. 84, and cases cited.) Such an instruction was not required here, because the "[i]nstructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (*id*., factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury." (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 42.)

### 11.  *Denial of Application to Modify Verdict*

More than two months after the jury returned a verdict of death, the trial court denied defendant's automatic application for modification of the death sentence.  Although defendant contends the denial was improper, he failed to object below to any aspect of the court's reasoning in denying the application. Defendant has therefore forfeited review of this claim. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1183.)

In any event, defendant's contentions lack merit.  In ruling on an application for modification of a death verdict, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the

evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).) " 'On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citation]. Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty.' [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1211 (*Carter*).)

The court's lengthy statement of reasons demonstrates it understood and complied with its obligation under section 190.4, subdivision (e). Defendant contends the court erred in considering in aggravation certain acts of violence which the court found had not been proved beyond a reasonable doubt. (See *People v. Michaels* (2002) 28 Cal.4th 486, 539 [evidence of a defendant's prior criminal activity may not be considered as an aggravating factor unless it is proven "beyond a reasonable doubt that the conduct occurred and constituted a crime"].) But notably, in describing the evidence of defendant's violent acts in prison and jail, the court stated: "The Court is not convinced that the evidence as to these acts rises to the level of proof beyond a reasonable doubt. Nevertheless, [defendant] was certainly a ready and willing participant in violent confrontations in custodial settings and tended to be very much in the 'thick of things' in such activities." The court's statements regarding its consideration of these custodial incidents are somewhat ambiguous and could likely have been clarified had defendant offered a contemporaneous objection. However, the court's comments during the course of its extensive review of the aggravating and mitigating evidence presented at trial demonstrate there is no reasonable possibility that any error affected its ruling. (See *Carter*, *supra*, 36 Cal.4th at p. 1211.) For the same

reason, any asserted federal constitutional error was harmless beyond a reasonable doubt. (*People v. Rogers* (2006) 39 Cal.4th 826, 911.)

Defendant further contends the trial court contravened our holding in *People v. Davenport* (1985) 41 Cal.3d 247, 289, by improperly treating the absence of a mitigating factor as an aggravating factor. We cannot agree. In discussing potential mitigating evidence of defendant's capacity to appreciate the criminality of his conduct (see § 190.3, factor (h)), the court stated: "There was none. There is no doubt that the defendant was able to and did understand the criminal wrongfulness of his conduct. Not only that, the defendant bragged the next day to Kevin Jackson that he had killed the two victims the previous day." Nothing in this statement remotely suggests that the court improperly considered the lack of section 190.3, factor (h) evidence to be aggravating. Instead, the court plainly concluded that defendant's ability to appreciate the criminality of his conduct was not a factor in mitigation, a conclusion it supported by reference to defendant's statements to Kevin Jackson.

### 12. Lack of Intracase Proportionality

After the penalty retrial, the trial court denied defendant's separately filed motion to bar the death penalty based on state and federal constitutional "intra-case proportionality principles and in the interest of justice." Defendant renews his contentions here.

" ' "To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If

57

the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." [Citation.]' [Citation.]" (*Wallace*, *supra*, 44 Cal.4th at p. 1099.)

Defendant asserts that, contrary to the evidence presented at his trial, two of his partners in the underlying crimes, Carl Bishop and Henry Jones, made statements to investigators suggesting that a fourth individual — Leon West, then at large — had been the one who had actually shot Monique Cleveland. These statements, which were not made under oath or subject to cross-examination, reflected vagueness on Bishop's part as to whether he actually saw West shoot Monique,[18] as well as an acknowledgement by Jones that he was in a different room when that shooting occurred. Not only did the trial court find Bishop's hearsay statements unreliable, but it remains the case that Kevin Jackson's trial testimony established, without contradiction, that defendant had boasted he shot Monique. In any event, as the court observed, even if defendant were only vicariously liable for Monique's murder, he and his three cohorts "were all together in the criminality that preceded the execution-style killing" of the newly expecting victim, and defendant himself began the violence by shooting Robert Cleveland in the face at close range.

Defendant also contends the extremely difficult childhood he endured militates against imposition of the death penalty. Although the circumstances of defendant's early childhood were difficult and sympathetic, the traumatic events

---

[18] Although Carl Bishop claimed at one point that he "[knew] for a fact" that Leon West shot the woman, he thereafter stated repeatedly that it was very dark in the hallway, that he had heard a shot, and that he had seen only a flash in the dark.

he experienced occurred nearly 17 years before the instant crimes and do not render his death sentence unconstitutional. Given the circumstances of defendant's participation in the instant crimes and his prior violent criminality, defendant's death sentence does not shock the conscience or offend fundamental notions of human dignity; nor is the sentence grossly disproportionate to his individual culpability. (*Wallace*, *supra*, 44 Cal.4th at p. 1099; see *Tison v. Arizona* (1987) 481 U.S. 137, 158 ["major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the . . . culpability requirement" for imposition of capital punishment in felony-murder cases].)[19]

### 13. Constitutional Challenges to California's Death Penalty Statute

Defendant raises a number of challenges to California's capital sentencing scheme. We have previously rejected each of defendant's contentions, and we adhere to those decisions, as follows.

Penal Code section 190.2 is not impermissibly broad and adequately narrows the class of murders for which the death penalty may be imposed. (*Jones*, *supra*, 54 Cal.4th at p. 85; *People v. Thomas* (2011) 51 Cal.4th 449, 506.) Section 190.3, factor (a), which defines the circumstances of the crime as one of the factors a jury may consider in determining the appropriate penalty, does not allow for the arbitrary and capricious imposition of the death penalty. (*Jones*, *supra*, at

[19] We note defendant also urged the trial court to reduce his sentence on the ground that the prosecution did not seek the death penalty against the two other individuals charged with participating in the crimes of violence against the Clevelands. That contention lacked merit. "[I]ntracase proportionality review is 'an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others.' [Citation.]" (*People v. Hill* (1992) 3 Cal.4th 959, 1014; see *People v. Riel* (2000) 22 Cal.4th 1153, 1223.)

pp. 85-86; *Thomas*, at p. 506; *People v. Cowan* (2010) 50 Cal.4th 401, 508 (*Cowan*).)

" 'Allowing consideration of unadjudicated criminal activity under [section 190.3,] factor (b) is not unconstitutional and does not render a death sentence unreliable. [Citations.]' [Citation.]" (*Jones, supra*, 54 Cal.4th at p. 87.)

"The trial court was not constitutionally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 730; see *Jones, supra*, 54 Cal.4th at p. 87.)

" ' "The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors." [Citations.] "[N]either the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty. [Citations.]" ' [Citation.] Moreover, the statute ' "is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination." ' [Citation.] . . . Nothing in the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (e.g., *Cunningham v. California* (2007) 549 U.S. 270; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) compels a different answer to these questions. [Citations.]" (*Cowan, supra*, 50 Cal.4th at pp. 508-509; see *Jones, supra*, 54 Cal.4th at p. 86.)

"There is no violation of the equal protection of the laws as a result of the statutes' asserted failure to provide for capital defendants some procedural guarantees afforded to noncapital defendants." (*People v. Alexander* (2010) 49 Cal.4th 846, 938; see *People v. Thomas*, *supra*, 51 Cal.4th at p. 507.)

Contrary to defendant's contention, intercase proportionality review is not required by the Eighth Amendment to the federal Constitution. (*Jones*, *supra*, 54 Cal.4th at p. 87; *People v. Thomas*, *supra*, 51 Cal.4th at p. 506.)

Finally, "California does not employ the death penalty as a ' "regular punishment for substantial numbers of crimes" ' [citation], and its imposition does not violate international norms of decency" or the federal Constitution. (*People v. Clark* (2011) 52 Cal.4th 856, 1008; see *People v. Blair* (2005) 36 Cal.4th 686, 754-755.)

### 14. Cumulative Error

Defendant contends the cumulative prejudicial effect of the errors in both the guilt and penalty phases of his trial requires reversal of his conviction and sentence of death. We have rejected the vast majority of defendant's assignments of error, and when we have found or assumed error, we have determined defendant was not prejudiced. Whether such claims are considered separately or together, we find no prejudicial error at either phase of the proceedings.

### III. DISPOSITION

The judgment of death is affirmed in its entirety.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

Four years ago, in *People v. Gamache* (2010) 48 Cal.4th 347, this court upheld a death verdict for Richard Gamache despite the fact that the jury, during its penalty phase deliberations, had inadvertently been allowed to view a videotape never admitted into evidence. (*Id.* at pp. 395–403.) The videotape, which the jury watched two times before sentencing Gamache to death, showed a detailed confession he had given to the police on the day of the crime. (*Id.* at pp. 395, 400–402.) We held that "[i]ntroduction of the . . . videotape into the jury room was indisputably error." (*Id.* at p. 396.) But we went on to conclude that the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*People v. Gamache*, at p. 399, fn. 22; *id.* at p. 403 ["[T]here is no reasonable possibility Gamache would have received a more favorable outcome had the . . . videotape not been erroneously placed in the jury room."].)

The United States Supreme Court denied review. (See *Gamache v. California* (2010) 562 U.S. __ [131 S.Ct. 591] (*Gamache*).) However, Justice Sotomayor, joined by Justice Ginsburg, Justice Breyer, and Justice Kagan, filed a statement respecting the denial of the petition for writ of certiorari. In that statement, Justice Sotomayor agreed that the error was harmless beyond a reasonable doubt, but she observed that this court, in reaching that conclusion, had said, " '[I]n the absence of misconduct, the burden remains with the *defendant* to demonstrate prejudice under the usual standard for ordinary trial error.' 48 Cal.4th, at 397 (emphasis added)." (*Id.* at p. __ [131 S.Ct. at p. 592].) Justice

1

Sotomayor said: "It is not clear what the court intended in allocating the burden to the defendant to demonstrate prejudice, but if it meant to convey that the defendant bore the burden of persuasion, that would contravene *Chapman*. See 386 U.S., at 24 (noting that the 'original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment'); cf. *O'Neal v. McAninch*, 513 U.S. 432, 438–439 (1995) (describing *Chapman* as 'placing the risk of doubt' about harmlessness on the State)." (*Ibid.*) The four-justice statement concluded with a warning: "With all that is at stake in capital cases [citation], in future cases the California courts should take care to ensure that their burden allocation conforms to the commands of *Chapman*." (*Id.* at p. __ [131 S.Ct. at p. 593].)

Today's decision neglects to heed this warning.

Defendant Jonathan Jackson was convicted of murder and sentenced to death while being forced, without lawful justification, to wear a REACT stun belt throughout his trial. REACT stands for Remote Electronically Activated Control Technology. Neither this colorless moniker nor anything in today's opinion provides an inkling of the power of this electric shock device. Here is how Chief Justice George, writing for a six-justice majority, described it in *People v. Mar* (2002) 28 Cal.4th 1201 (*Mar*): " 'The type of stun belt which is used while a prisoner is in the courtroom consists of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing. This band wraps around the prisoner's waist and is secured by a Velcro fastener. The belt is powered by two 9-volt batteries connected to prongs which are attached to the wearer over the left kidney region. . . . [¶] The stun belt will deliver an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is

2

generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to suffer heartbeat irregularities or seizures. [Citations.]' " (*Id.* at pp. 1214–1215.)

An article we quoted in *Mar* described a brochure of the belt's manufacturer, Stun Tech, as follows: "One of the great advantages, the company says, is its capacity to humiliate the wearer. 'After all, if you were wearing a contraption around your waist that by the mere push of a button in someone else's hand could make you defecate or urinate yourself,' the brochure asks, 'what would that do to you from the psychological standpoint?' And if the shock ever has to be administered? 'One word —,' brags the brochure, 'DEVASTATION!' " (Schulz, *Cruel and Unusual Punishment* (Apr. 24, 1997) 44 N.Y. Review of Books 51, 51; see *Mar*, *supra*, 28 Cal.4th at p. 1227, fn. 8.) The Indiana Supreme Court has banned the use of stun belts in the courtrooms of that state altogether, concluding that other forms of restraint "can do the job without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated." (*Wrinkles v. State* (Ind. 2001) 749 N.E.2d 1179, 1195.)

While mindful that trial judges must have broad discretion to deal with "disruptive, contumacious, stubbornly defiant defendants" (*Illinois v. Allen* (1970) 397 U.S. 337, 343), we observed in *Mar* that the use of a stun belt to maintain control over the accused during trial "has not been without problems or controversy." (*Mar*, *supra*, 28 Cal.4th at p. 1205.) The belt has been abused, as when one California trial judge ordered a defendant to be shocked for verbally interrupting her. (*Id.* at p. 1223, fn. 6, citing *Hawkins v. Comparet-Cassani* (9th Cir. 2001) 251 F.3d 1230.) There have been "a disturbing number of accidental

3

activations," including at least one instance in a California courtroom "resulting in the defendant's hospitalization." (*Mar*, at pp. 1228, 1229, fn. 9.) Most importantly, the " ' "total psychological supremacy" ' " that the stun belt is designed to achieve "may impair the defendant's ability to think clearly, concentrate on the testimony, communicate with counsel at trial, and maintain a positive demeanor before the jury." (*Id.* at p. 1226.)

Against this backdrop, the court today concludes that any error in requiring defendant to wear a stun belt throughout this capital trial was harmless beyond a reasonable doubt. I respectfully disagree with this conclusion and, in particular, with two aspects of the court's reasoning.

First, even though it is undisputed by the parties that the trial court erred in forcing defendant to wear the stun belt, today's opinion resolves defendant's claim on the basis of harmless error without actually finding that the trial court erred. The court instead offers the vague locution that "[i]n light of the People's concession at oral argument that the trial court erred under *Mar*, *supra*, 28 Cal.4th 1201, we proceed directly to the issue of prejudice." (Maj. opn., *ante*, at p. 19.) Does this mean the court *accepts* the Attorney General's concession on the merits? Or does it mean the court is merely *assuming* error, as we often do, in order to resolve the issue on harmless error grounds? The court does not say. By tiptoeing around the issue, today's opinion fails to confront the seriousness of the error and may be read to suggest that there is some question as to whether error occurred at all — even though, as both parties recognize and as I explain herein, the error in this case is at least as apparent as similar errors in other cases finding inadequate justification for physical restraints during trial. The court's refusal to find error on this record sows unnecessary doubt about the stringent standards that govern the use of restraints in the courtroom.

4

Second, the court concludes that "the People have satisfied their burden under *Chapman*, *supra*, 386 U.S. 18, to show that any federal errors are harmless beyond a reasonable doubt." (Maj. opn., *ante*, at p. 25.)  I agree the error was harmless at the guilt phase, but I cannot agree it was harmless at the penalty retrial.  Wearing a stun belt carries a substantial risk of altering a defendant's demeanor, and a defendant's demeanor is often one of the most important considerations for the jury in deciding whether a capital defendant deserves to live or die.  (See *Riggins v. Nevada* (1992) 504 U.S. 127, 143–144 (*Riggins*) (conc. opn. of Kennedy, J.).)  As discussed below, the record here provides reason to worry about this risk.  Moreover, the penalty determination in this case was a close issue.  The first jury, which saw and heard the entirety of the guilt phase evidence, hung at the penalty phase, with nine jurors willing to go either way and one or two jurors opposed to death.  The second jury was empaneled only for the penalty retrial.  We cannot say with any confidence what verdict it would have reached absent the stun belt error.

Today's ruling simply cannot be squared with *Chapman*'s principle that the burden lies with "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.)  The court holds that "reversal of a judgment is unwarranted when the record on appeal is devoid of evidence that the unjustified use of . . . a stun belt had any adverse effect." (Maj. opn., *ante*, at p. 14.)  But under *Chapman*, reversal is unwarranted *not* when the record is devoid of evidence that the error had an adverse effect, but *only* when the state has shown beyond a reasonable doubt that the error *did not* have an adverse effect.  Today's opinion effectively puts the burden on defendant to demonstrate that the erroneous use of the stun belt was prejudicial.  The court even goes so far as to supply, on the state's behalf, an argument for harmless error that the state itself never made.  (See

5

*post*, at pp. 40–41.)  In essence, the court inverts *Chapman*'s burden allocation in the very manner that four justices of the high court warned against in *Gamache*.  (See *Gamache*, *supra*, 562 U.S. at p. __ [131 S.Ct. at p. 593] (statement of Sotomayor, J.).)  At most, the court's analysis of the record in this case establishes that it is *uncertain* whether defendant was prejudiced at the penalty retrial, not that the state has shown *beyond a reasonable doubt* that defendant was *not* prejudiced.  To conclude otherwise, as the court does, confirms that "the allocation of the burden of proving harmlessness can be outcome determinative in some cases." (*Id.* at p. __ [131 S.Ct. at p. 593].)

To observers of this court, it is no mystery that harmless error doctrine has played a major role in the outcomes of California capital appeals.  Unfortunately, today's decision is not unique in our jurisprudence; it is only the most recent instance in which this court has misapplied *Chapman*.  (See *post*, at pp. 45–48.) Here, a man was unlawfully forced to have a 50,000-volt electric shock device strapped around his waist while a jury sat in judgment as to whether he should live or die for his crimes.  It is reasonably possible that the stun belt adversely affected his demeanor, and we cannot know what decision the jury would have made absent this error.  Because the court's refusal to find prejudicial error in this case erodes the applicable standards for both error and prejudice, I respectfully dissent.

## I.

When used for courtroom security, a stun belt " 'is worn underneath the prisoner's clothing' " (*Mar*, *supra*, 28 Cal.4th at p. 1214), so it may be presumed to be out of the jury's sight.  Nevertheless, the legal standards governing the use of stun belts have their origins in concerns applicable to the use of visible restraints such as shackles.  I begin by reviewing the development of those standards in state and federal law, and then apply them to the facts of this case.

6

## A.

"A trial court has broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269; see *Illinois v. Allen*, *supra*, 397 U.S. at p. 343.) But this power is not unlimited. The constitutional prohibition on forcing a criminal defendant to wear visible physical restraints during trial without special justification "has deep roots in the common law." (*Deck v. Missouri* (2005) 544 U.S. 622, 626 (*Deck*) [citing Blackstone and other early authorities]; see *People v. Duran* (1976) 16 Cal.3d 282, 288 (*Duran*) [same].) Although originally motivated by concern for the physical suffering caused by chains or other restraints, the constitutional rule today reflects "three fundamental legal principles." (*Deck*, at p. 630.)

"First, the criminal process presumes that the defendant is innocent until proved guilty. [Citation.] Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." (*Deck*, *supra*, 544 U.S. at p. 630.) "Second, the Constitution, in order to help the accused secure a meaningful defense, provides him with a right to counsel. [Citations.] The use of physical restraints diminishes that right. Shackles can interfere with the accused's 'ability to communicate' with his lawyer. [Citation.] Indeed, they can interfere with a defendant's ability to participate in his own defense . . . ." (*Id.* at p. 631.) "Third, judges must seek to maintain a judicial process that is a dignified process. The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to

7

serve.  The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives." (*Ibid.*)

The first concern, the presumption of innocence, is not a factor during the penalty phase of a capital case.  But in light of the second and third concerns, along with "the ' "severity" ' and ' "finality" ' of the sanction" and "the 'acute need' for reliable decisionmaking when the death penalty is at issue," courts may not place defendants in visible restraints during either the penalty phase or the guilt phase of a capital trial without a "case specific" determination that "reflect[s] particular concerns, say, special security needs or escape risks, related to the defendant on trial." (*Deck*, *supra*, 544 U.S. at pp. 632–633.)

**1.**

Consistent with *Deck*, California case law has long recognized limitations on the use of physical restraints on criminal defendants during trial.  (See *Mar*, *supra*, 28 Cal.4th at pp. 1216–1218.)  In *People v. Harrington* (1871) 42 Cal. 165 (*Harrington*), this court said that "any order or action of the Court which, without evident necessity, imposes physical burdens, pains and restraints upon a prisoner during the progress of his trial, inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional right of defense . . . ." (*Id.* at p. 168.)  There, finding "no pretense of necessity for the manacles and chains upon the defendants during their trial," we reversed the convictions.  (*Id.* at p. 169.)

In *Duran*, we declared "our continued adherence to the *Harrington* rule" in light of the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand." (*Duran*, *supra*, 16 Cal.3d at p. 290.)  *Duran* "reaffirm[ed] the rule that a defendant cannot be subjected to

8

physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*Id.* at pp. 290–291, fn. omitted.) We further concluded that "in any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances." (*Id.* at p. 291.)

*Duran* went on to specify that "[t]he showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record, and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence. The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran*, *supra*, 16 Cal.3d at p. 291.) Applying these principles in *Duran*, we found an abuse of discretion: "No reasons for shackling the defendant appear on the record. There is no showing that defendant threatened to escape or behaved violently before coming to court or while in court. The fact that defendant was a state prison inmate who had been convicted of robbery and was charged with a violent crime did not, without more, justify the use of physical restraints." (*Id.* at p. 293.)

In subsequent cases, we have emphasized that in deciding whether to impose restraints, "the court is obligated to base its determination on facts, not rumor and innuendo." (*People v. Cox* (1991) 53 Cal.3d 618, 652 (*Cox*); see *ibid.* [finding shackling unwarranted where the record "does not contain a single substantiation of violence or the threat of violence on the part of the accused"].) We have also stressed that "it is the trial court, not law enforcement personnel, that must make the decision an accused be physically restrained in the courtroom. A trial court abuses its discretion if it abdicates this decisionmaking authority to security personnel or law enforcement. [Citations.]" (*People v. Hill* (1998) 17

9

Cal.4th 800, 841, fn. omitted (*Hill*); see *id.* at p. 842 [finding shackling unjustified where the trial court "deferred to the sheriff's department's decision that shackles were necessary" and "fail[ed] to determine independently whether, in its view, there existed a manifest need to place defendant in restraints"].)  Likewise, " '[t]he imposition of restraints in a proper case is normally a judicial function in which the prosecutor plays no necessary part. . . .  [I]t is the function of the court, not the prosecutor, to initiate whatever procedures the court deems sufficient in order that it might make a due process determination of record that restraints are necessary.' (*Duran*, *supra*, 16 Cal.3d at p. 293, fn. 12.)" (*Id.* at pp. 841–842.)

In *Mar*, we had our "first occasion . . . to address the use of a stun belt in courtrooms in California." (*Mar*, *supra*, 28 Cal.4th at p. 1205.)  Because "the stun belt posed an imminent risk of both serious injury and humiliation," we held that the principles set forth in *Duran* governing the use of visible restraints apply equally to the use of a stun belt worn underneath a defendant's clothing. (*Mar*, at p. 1219.)  We explained:  "In light of the nature of the device and its effect upon the wearer when activated, requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may impair a defendant's capacity to concentrate on the events of the trial, interfere with the defendant's ability to assist his or her counsel, and adversely affect his or her demeanor in the presence of the jury.  In addition, past cases both in California and in other jurisdictions disclose that in a troubling number of instances the stun belt has activated accidentally, inflicting a potentially injurious high-voltage electric shock on a defendant without any justification.  The potential for accidental activation provides a strong reason to proceed with great caution in approving the use of this device." (*Id.* at p. 1205.)  Accordingly, we concluded that a defendant may not be forced to wear a stun belt unless there is an on-the-record showing of manifest need based on the trial court's own determination of

10

the facts and independent judgment under the circumstances. (*Id.* at pp. 1219–1223.) Because "the trial court [in *Mar*] never made, nor purported to make, a finding or determination that there was a 'manifest need' to impose the stun belt upon defendant because he posed a serious security threat in the courtroom," we found an abuse of discretion. (*Id.* at p. 1222; see *ibid.* [use of the stun belt resulted from an "apparently unilateral decision" by the bailiff or jail officials].)

We recently summarized the governing principles for use of a stun belt as follows: "(1) there must be a showing of manifest need for the stun belt; (2) the defendant's threatening or violent conduct must be established as a matter of record; and (3) it is the function of the court to initiate whatever procedures it deems necessary to make a determination on the record that the stun belt is necessary. The court must make an independent determination based on facts, not rumor or innuendo, and must not merely rely on the judgment of jail or court security personnel. [Citations.]" (*People v. Howard* (2010) 51 Cal.4th 15, 28 (*Howard*).) Although the trial in the case now before us predates *Mar*, we said in *Mar* and in subsequent cases that the manifest need standard for use of a stun belt applies to trials conducted before *Mar*. (*Mar*, *supra*, 28 Cal.4th at pp. 1222–1223; see, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1270–1271; *People v. Lomax* (2010) 49 Cal.4th 530, 561; *People v. Gamache*, *supra*, 48 Cal.4th at pp. 366–367.) For trials conducted after *Mar*, the requirements are even more stringent, as trial courts must take into account several additional considerations specific to stun belts before forcing a defendant to wear one. (See *Mar*, at pp. 1226–1230.)

**2.**

In light of *Mar*, the standards governing the use of a stun belt during trial are settled as a matter of California law. The issue is not entirely settled, however, as a matter of federal constitutional law.

11

Many courts have adopted federal constitutional standards similar to those we set forth in *Mar*. In *United States v. Durham* (11th Cir. 2002) 287 F.3d 1297 (*Durham*), the court observed that "stun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways." (*Id.* at p. 1306.) First, a stun belt "seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles. The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial — including those movements necessary for effective communication with counsel." (*Id.* at p. 1305.) Second, a stun belt could have an "adverse impact" on a "defendant's Sixth Amendment and due process rights to be present at trial and to participate in his defense. Wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt. A defendant is likely to concentrate on doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial." (*Id.* at pp. 1305–1306, fn. omitted.) Finally, "stun belts have the potential to be highly detrimental to the dignified administration of criminal justice. . . . Shackles are a minor threat to the dignity of the courtroom when compared with the discharge of a stun belt, which could cause the defendant to lose control of his limbs, collapse to the floor, and defecate on himself." (*Id.* at p. 1306.) The Eleventh Circuit adopted substantive and procedural standards almost identical to those we established in *Mar* and held that the district court in *Durham* "abused its discretion" in ordering a stun belt because it "did not, on the record, consider any less restrictive alternatives" and did not articulate "on the

12

record" a "rationale for imposing this highly intrusive method of restraint."
(*Durham*, at p. 1308; see *id.* at p. 1312 (conc. opn. of Tjoflat, J.).)

A number of other jurisdictions, applying federal constitutional law, have reached similar results. (See *United States v. Wardell* (10th Cir. 2009) 591 F.3d 1279, 1293–1294 [holding that " '[t]he use of stun belts, depending somewhat on their method of deployment, raises all of the traditional concerns about the imposition of physical restraints' " and that a district court must make "a defendant-specific determination of necessity resulting from security concerns"]; *Wrinkles v. Buss* (7th Cir. 2008) 537 F.3d 804, 813–815 [finding defense counsel's failure to object to stun belt where there was no "individualized justification" for imposing it to be deficient performance under first prong of *Strickland v. Washington* (1984) 466 U.S. 668]; *United States v. Miller* (6th Cir. 2008) 531 F.3d 340, 344–346 (*Miller*) [holding that district court erred "[b]y deferring to the Marshals' judgment" instead of making "individualized determinations or specific findings" to justify use of stun belt]; *Gonzalez v. Pliler* (9th Cir. 2003) 341 F.3d 897, 901–902 (*Gonzalez*) [finding stun belt error where the "decision was apparently made by the bailiff, not the trial judge," the record was devoid of evidence that the defendant posed a security problem, and the trial court failed to consider less restrictive alternatives]; *Mobley v. State* (Tenn. 2013) 397 S.W.3d 70, 101 [requiring "particularized findings" that include "whether there is a less onerous but adequate means of providing security"]; *Illinois v. Allen* (Ill. 2006) 856 N.E.2d 349, 353–354 (*Allen*) [holding that "the use of electronic stun belts in the courts of this state is warranted only where there has been a showing of manifest need for the restraint" and finding that the trial court erred because "it simply deferred to the judgment of the sheriff"]; *Hymon v. Nevada* (Nev. 2005) 111 P.3d 1092, 1098–1099 [adopting the standards of *Durham*, *Gonzalez*, and *Mar* as a matter of federal constitutional law]; *Weaver v. State* (Fla. 2004) 894 So.2d

178, 195 [stun belt must be "reasonably necessary to ensure order and safety in the courtroom," and trial court must consider whether "alternative forms of restraint . . . are less prejudicial or viable"].)

Notwithstanding this substantial body of authority, the United States Supreme Court has yet to provide definitive guidance on the use of stun belts, and as a consequence, a number of courts have upheld their use under less stringent standards on habeas or plain error review (see, e.g., *Earhart v. Konteh* (6th Cir. 2009) 589 F.3d 337, 349; *United States v. Fields* (5th Cir. 2007) 483 F.3d 313, 356–357; *Mungo v. United States* (D.C. 2010) 987 A.2d 1145, 1149–1150; *State v. Bowen* (Ore. 2006) 135 P.3d 272, 279; *Reynolds v. State* (Ala.Crim.App. 2010) 114 So.3d 61, 82) or as a matter of state law (see *State v. Benson* (Ariz. 2013) 307 P.3d 19, 28; *Young v. State* (Ga. 1998) 499 S.E.2d 60, 61). The high court last considered the issue of physical restraints during trial almost a decade ago in *Deck*, *supra*, 544 U.S. 622, which set forth rigorous standards for the use of visible restraints. Since then, courts have divided on the applicability of *Deck* to a stun belt worn underneath a defendant's clothing and shielded from the jury's view. (Compare *Miller*, *supra*, 531 F.3d at p. 345 [concluding on plain error review that a concealed stun belt raises the " 'same fundamental issues' " as those considered in *Deck*] and *Allen*, *supra*, 856 N.E.2d at p. 352 ["the *Deck* Court's stated reasons which prompt due process scrutiny in visible restraint cases . . . may be applied with like force to stun belts which are not necessarily visible to the jury"] with *Mungo*, *supra*, 987 A.2d at pp. 1149–1150 [concluding on plain error review that *Deck* does not entail that "a stun belt qualifies as a type of physical restraint whose use is subject to [*Deck*'s] strictures" or that "on-the-record findings are required before stun belts may be used"] and *Benson*, *supra*, 307 P.3d at pp. 28–29 [distinguishing *Deck* where "the record reflects that the stun belt . . . [was] not visible to the jury"].) For the reasons stated in *Durham* and *Mar*, the better view is

14

that a requirement of individualized on-the-record justification applies not only to visible restraints but also to stun belts as a matter of federal constitutional law.

**B.**

In this case, two trial judges entered two separate orders requiring defendant to wear a stun belt: the first for the duration of the guilt phase and the first penalty phase, and the second for the penalty phase retrial. On appeal, defendant contends that each order violated his rights under the California Constitution and the United States Constitution. The record clearly indicates that neither order was supported by a proper finding of manifest need.

**1.**

Before the guilt phase, defendant submitted a motion objecting to physical shackling. In response, the prosecutor requested a stun belt as an alternative to shackling, arguing that a stun belt was not a physical restraint within the meaning of *Duran*. (See *People v. Garcia* (1977) 56 Cal.App.4th 1349, 1356 (*Garcia*), disapproved by *Mar*, *supra*, 28 Cal.4th at p. 1219.) At a hearing on March 30, 1999, the prosecutor said, "I feel very strongly about this defendant having a react belt during this trial." The trial court inquired whether defendant's objection would apply to a stun belt. Defense counsel replied, "My position would be that Mr. Jackson has demonstrated his ability to be responsible in the courtroom and that we don't need anything."

The court then ruled as follows: "I tell you what we will do, if we have two deputies[,] and they try to give two deputies on murder cases, we will not have the react belt. . . . I have evidence in the Statement of Aggravation that [defendant] did make a threat, he has engaged in violence in custody, and there is some — I don't have a clear record of it but there is certainly hints from the probation report that he had when he was in [the California Youth Authority] and there is also information apparently from the CDC 115s that he has posed some threat to other

15

people. [¶] And it seems to me in a courtroom context if things don't go the right way there might be a problem with him. . . . [¶] I think you ought to tell the sergeant it would be my strong preference to have a second deputy sitting back there so we can avoid this problem. Tell them if it's not, then I will have a react belt, and it's my understanding you have to have a second deputy then anyway." The courtroom deputy confirmed that if the court ordered defendant to wear the stun belt, a second deputy would be provided to monitor the belt. The court then told the deputy, "Tell the sergeant if you can, please, that if he forces me to order the react belt in order to get a second deputy here I will do that."

The prosecutor objected to the court's ruling on the ground that "there is really no showing required for a react belt, because it's not a restraint. It's been held they are not even a restraint on the defendant." The court nevertheless confirmed its decision, commenting: "If there is [*sic*] problems going on with intimidation of witnesses or something else is occurring we will deal with it at that point. But at this point, given Deputy Young's confidence that he can handle the situation with a second deputy, I think it would be inappropriate to have the react belt."

The trial court continued to explain its reasoning, stating: "This is not an easy case . . . to make a decision on because I have allegations — of course, I am at somewhat of a loss because these things haven't been proved, but I think I have to assume from the starting point that there may be some basis for these things." The court continued: "Sure he isn't causing a problem now because he is always handcuffed and dressed in orange . . . . [H]e is in a situation where he really can't cause much problems. [¶] On the other hand, . . . I haven't had a problem with him in court. He has been cooperative. He hasn't mouthed off in any way. And the cases are clear that if I could avoid shackling him or handcuffing him or anything like that I should do that. So I don't intend to do that."

16

Finally, the court restated its decision: "[W]hat I'm going to do is call Captain Moreland, who is the person over in the jail, and tell him that I need to have a second deputy, if you can't provide it I will need to order the react belt, which then will require a second deputy because there is always a deputy that monitors the react belt."

A week later, on April 6, 1999, the court announced that defendant would be required to wear a stun belt for the duration of trial. The court explained, "I could not be assured of a second officer without having the REACT Belt."

On this record, it is clear that the trial court's order was an abuse of discretion. The trial court made no determination that the stun belt was necessary for courtroom security. While noting that defendant "has engaged in violence in custody," the court acknowledged that there was no "clear record" defendant posed a security threat, that defendant "has been cooperative" and "hasn't mouthed off in any way," that "I haven't had a problem with him in court," and that the contrary indications consisted of "allegations" that "haven't been proved." Moreover, the court said "it would be inappropriate to have the react belt" in light of its judgment that any threat posed by defendant could be handled by the presence of a second deputy in the courtroom. The trial court ultimately decided to order the stun belt not because it had made a finding that the belt was necessary to restrain defendant, but because it "could not be assured of a second officer without having the REACT Belt." As a result, defendant was guarded by two deputies *and* forced to wear a stun belt during trial.

When ordering restraints, "[a] trial court abuses its discretion if it abdicates [its] decisionmaking authority to security personnel or law enforcement." (*Hill*, *supra*, 17 Cal.4th at p. 841; see *Miller*, *supra*, 531 F.3d at pp. 344–346; *Gonzalez*, 341 F.3d at pp. 901–902; *Allen*, *supra*, 856 N.E.2d at pp. 353–354.) From this principle, it follows that a trial court abuses its discretion when it permits such

17

personnel to make their presence contingent on the court's decision to order the use of restraints. It is well established that "a court should impose the least restrictive measure that will satisfy the court's legitimate security concerns." (*Mar*, *supra*, 28 Cal.4th at p. 1206; see *Durham*, *supra*, 287 F.3d at p. 1308.) Here, the trial court determined that having a second officer in the courtroom would have been adequate. Because the court's decision to order the stun belt was driven by the sheriff's department's staffing policy rather than by any finding of manifest need, it was an abuse of discretion.

**2.**

Before the penalty retrial, defendant was again ordered to wear a stun belt, this time by a second judge who had just begun to preside over the case. At a hearing on October 21, 1999, the prosecutor initiated discussion of the issue and asked the court to order "[t]he zapping belt, the react belt." In response, the court observed, "I've been informed that there was a need for such by the sheriff's department and my deputy." At that point, defense counsel said: "Well, I would object to the belt, not only as I believe it's unnecessary, but it's extremely uncomfortable for the defendant. I would ask that the Court use the leg brace on him. It fits underneath the clothing. I think that's ample restriction on his movement and more than an adequate means of securing him in this courtroom. He hasn't done anything in the past to exhibit any kind of unruly behavior or any disrespect to the Court or any staff. I just think it's unnecessary."

The court responded: "It's my understanding that although there has not been any issue in the courtroom, there has been sufficient issues out of the courtroom that give rise to considerable concern for the safety of the public and the safety of deputies who would be called upon to attend to the security of the defendant and the people in attendance. . . . Unfortunately, my bailiff who brought the subject to me originally is not with us this morning." The court

18

continued: "He knew something of the background of the defendant, and I didn't ask him to go into any detail when he broached the subject the day before yesterday."

The prosecutor proceeded to argue, as she had at the guilt phase, that a stun belt was unlike other physical restraints and that the court was not required to make any special finding before ordering defendant to wear it. When the trial court said it was not aware that the belt had been uncomfortable to wear, defense counsel responded: "The trial days are long, and what my concern is is that the belt is uncomfortable. It's a large object that's placed on the kidney area, the liver area on his back. It makes it difficult to sit back. And I believe that because of the fact this is [*sic*] capital case, every caution and concern should be made to protect the rights of the defendant. I'm worried about any unconscious grimacing or exhibitions of discomfort that Mr. Jackson might make that might be misconstrued by the jury as a reaction to witness testimony or anything like that. But we did in the last trial try to alleviate that discomfort by giving him a pillow to kind of even out the back so when he sat back, he wouldn't be putting all the pressure onto that react unit that's strapped to him. That caused a little bit of relief, but I don't think significant."

The court then said: "[F]rom the little I've seen, it appears that the defendant is sufficiently violent that it's not a matter of we're concerned about so much his escape, which would be the subject of the leg restraint . . . ." The court continued: "[H]ere we're concerned about the violent nature of his responses to people in authority. And that just is not sufficiently addressed by a leg brace. . . . It will not keep him from attacking members of the public or the attachés and his own counsel . . . . [¶] . . . I'm not about to have this [be] a matter of something that we wish we would have done in retrospect which would have avoided some serious injury."

19

Finally, after observing that there was no reason to shackle defendant if the stun belt was an available alternative, the court ruled as follows: "[S]ince the Court is opposed to shackling and since the Court feels that the leg brace is, in the opinion of the Court, insufficient to secure the safety of the public, the attachés and so on, counsel, from violent attacks by the defendant, the use of the react belt is approved . . . ."

This order was also an abuse of discretion. The information on which the second trial judge relied was precisely the sort that case law has found insufficient. In raising a safety concern, the trial court made reference to "sufficient issues out of the courtroom" and "the violent nature of [defendant's] responses to people in authority" without ever identifying what the specific issues or incidents were. Further, rather than "mak[ing] its *own* determination of the 'manifest need' for the use of such restraint," the trial court "rel[ied] solely on the judgment of jail or court security personnel in sanctioning the use of such restraints." (*Mar*, *supra*, 28 Cal.4th at p. 1218.) The court acknowledged that "there has not been any issue in the courtroom" and did not point to any on-the-record evidence that defendant posed a security threat during trial. Instead, the trial court relied on unidentified information it had been told in off-the-record conversations with the sheriff's department and the bailiff. By the court's own account, those conversations were not in-depth; the bailiff "knew something of the background of the defendant," but the court "didn't ask him to go into any detail." (See *Cox*, *supra*, 53 Cal.3d at p. 652 ["the court is obligated to base its determination on facts, not rumor and innuendo"].) In sum, the record does not "demonstrate that the trial court independently determined on the basis of an on-the-record showing of defendant's nonconforming conduct that 'there existed a manifest need to place defendant in restraints.' " (*Mar*, *supra*, 28 Cal.4th at p. 1218; see *Durham*, *supra*, 287 F.3d at

20

p. 1308.) Thus, I would conclude that the trial court erred under state and federal law in forcing defendant to wear a stun belt during the penalty retrial.

**3.**

Today's opinion neither agrees nor disagrees with the analysis above. The court simply says: "In light of the People's concession at oral argument that the trial court erred under *Mar*, *supra*, 28 Cal.4th 1201, we proceed directly to the issue of prejudice." (Maj. opn., *ante*, at p. 19.) I am not sure what this sentence is supposed to mean, but it certainly leaves the reader with the impression that the court, by refusing to say it *accepts* the Attorney General's concession, is not fully convinced that use of the stun belt was error.

Although it is not rare for our court to decline to resolve an issue on the merits when it can be resolved on the basis of harmless error, this practice is typically reserved for issues that present a close question, where the risk of an incorrect ruling or unintended consequences may counsel restraint. In this case, the trial court's errors in ordering the stun belt are no less obvious than the similar errors found in *Mar*, *Durham*, *Miller*, *Gonzalez*, and *Allen*. (See *ante*, at pp. 11–14.) Indeed, after reciting defendant's arguments on this issue (maj. opn., *ante*, at pp. 18–19), today's opinion does not even bother to state any counterarguments, for there are none that could withstand scrutiny under well-established law. Any hesitation the court may have about finding error is simply unexplained. The court's refusal to find error under these circumstances sows unnecessary doubt about the rigorous standards that govern the use of restraints in the courtroom. Even if this were unintended, the upshot remains that a violation of the right to be free of unjustified restraints during trial has gone unrecognized. We should not allow due process of law to be silently eroded in this way.

21

## II.

I agree with today's decision that the stun belt was not prejudicial at the guilt phase because the belt's potential effect on defendant's demeanor was not relevant to the jury's determination of the objective facts comprising his crimes and because defendant does not contend he would have testified or otherwise aided his defense at the guilt phase had the court not ordered the belt. However, I cannot agree that the stun belt error was harmless beyond a reasonable doubt at the penalty retrial, where it is reasonably possible that the stun belt adversely affected defendant's demeanor in a way that contributed to the jury's verdict. In reaching a contrary result, the court effectively assigns to defendant the burden of proving that the error was prejudicial, thereby inverting *Chapman*'s requirement that the state demonstrate lack of prejudice beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24; see *Gamache*, *supra*, 562 U.S. at p. __ [131 S.Ct. at p. 593] (statement of Sotomayor, J.).) This case illustrates that the conceptual and institutional difficulties inherent to harmless error analysis call for strict adherence to established legal standards in assessing prejudice, especially when it comes to errors in the penalty phase of a capital trial.

## A.

To illuminate what is problematic about today's decision, I begin by bringing into focus the nature of harmless error analysis and the importance of the legal standards that guide it.

At bottom, harmless error inquiry mediates a basic tension in the law. On one hand, few if any trials are entirely free from error, and an appellate court would impair the basic functioning of the criminal justice system if it were to reverse a conviction whenever some slight misstep occurred. This is a lesson learned from experience. Until the beginning of the last century, a rule of near-automatic reversal prevailed in criminal matters such that, " 'as one trial judge put

22

it . . . [,] courts of review 'tower[ed] above the trials of criminal cases as impregnable citadels of technicality.' " (*Kotteakos v. United States* (1946) 328 U.S. 750, 759.) As a result, "criminal trials became a game for sowing reversible error in the record, only to have repeated the same matching of wits when a new trial had been thus obtained." (*Ibid.*) It was in response to such problems that many jurisdictions, including California, adopted measures to limit reversals of judgments only to cases where substantial errors had occurred. (*Id.* at pp. 759–760; see Cal. Const., art. VI, § 16; *People v. O'Bryan* (1913) 165 Cal. 55, 63–66.)

On the other hand, an appellate court runs two related risks when it evaluates the effect of an error to determine whether it warrants reversal. First, to say that a conviction may stand in spite of underlying error is at odds with the norm of legality that justifies the state's imposition of criminal punishment in the first place. A declaration that an error is harmless is, in essence, a conclusion that even though a legal right has been violated, there will be no remedy for that violation. As former D.C. Circuit Chief Judge Harry Edwards has put it, "each time we employ the imaginary tonic of harmless error, we erode an important legal principle. When we hold errors harmless, the rights of individuals, both constitutional and otherwise, go unenforced." (Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?* (1995) 70 N.Y.U. L.Rev. 1167, 1170 (Edwards).) Divorcing legal rights from remedies in this fashion may encourage, or at least fail to discourage, future violations by undermining the "deterrent force of a reversal." (*Ibid.*)

Second, when an appellate court engages in harmless error inquiry, it risks invading the province of the jury. A court trying to determine what would have happened in a counterfactual proceeding in which the error at issue did not occur may end up, consciously or not, conducting an inquiry into a defendant's guilt or innocence, a question that our system of justice reserves for the jury. (See

23

*Apprendi v. New Jersey* (2000) 530 U.S. 466, 476–484; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 280.) The risk of an appellate court usurping the jury's role becomes especially great when harmless error analysis focuses not on whether error might have affected the jury's decisionmaking, but on whether there was overwhelming evidence to support the result. As Chief Justice Traynor explained, "It is one thing for an appellate court to determine that a verdict was or was not affected by error. It is quite another for an appellate court to become in effect a second jury to determine whether the defendant is guilty." (Traynor, The Riddle of Harmless Error (1970) p. 21 (Traynor); see *Neder v. United States* (1999) 527 U.S. 1, 31–32 (conc. & dis. opn. of Scalia, J.); *Sullivan*, at p. 28; Edwards, *supra*, 70 N.Y.U. L.Rev. at pp. 1185–1199; Field, *Assessing the Harmlessness of Federal Constitutional Error — A Process in Need of a Rationale* (1976) 125 U. Pa. L.Rev. 15.)

These two risks arise in unique and potentially troubling ways when a reviewing court assesses the prejudicial impact of errors in the penalty phase of a capital trial. To state the obvious, it is no small thing for a court of law to affirm a sentence of death while holding that the defendant's legal rights were violated in the sentencing proceeding. This court has recognized as much in holding that an exacting "reasonable possibility" standard of harmless error review — which is " 'the same, in substance and effect,' as the harmless-beyond-a-reasonable-doubt standard of *Chapman*" — specially applies when evaluating any error that occurs during the penalty phase of a capital trial. (*People v. Cowan* (2010) 50 Cal.4th 401, 491; see *People v. Gonzalez* (2006) 38 Cal.4th 932, 961; *People v. Ashmus* (1991) 54 Cal.3d 932, 990; *People v. Brown* (1988) 46 Cal.3d 432, 448 (*Brown*).) Our less stringent "reasonable probability" standard applicable to ordinary state law errors (*People v. Watson* (1956) 46 Cal.2d 818, 837) is "simply insufficient to ensure 'reliability in the determination that death is the appropriate punishment in

24

a specific case.' " (*Brown*, at p. 448; see *Deck*, *supra*, 544 U.S. at p. 632 ["The Court has stressed the 'acute need' for reliable decisionmaking when the death penalty is at issue."].)

Moreover, we have long "recognized a fundamental difference between review of a jury's objective guilt phase verdict, and its normative, discretionary penalty phase determination" in a capital trial. (*Brown*, *supra*, 46 Cal.3d at p. 447.) The nature of the task assigned to the jury at the penalty phase of a capital trial makes it particularly difficult to analyze identified error for harmlessness. "A capital penalty jury . . . is charged with a responsibility different in kind from . . . guilt phase decisions: its role is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant . . . ." (*Id.* at p. 448; see *Woodson v. North Carolina* (1976) 428 U.S. 280.) In light of the jury's "vast discretion" in making this decision and the endless variety of factors that may affect its judgment (*Brown*, at p. 447), a counterfactual assessment of whether an error did not influence the jury can be "extremely speculative or impossible." (*Clemons v. Mississippi* (1990) 494 U.S. 738, 754; cf. Traynor, *supra*, at p. 73 ["[A]n appellate court cannot possibly determine what factors influenced a jury to impose the death penalty. Any error, unless it related only to the proof of some fact otherwise indisputably established, might have tipped the scales against the defendant."]; Carter, *Harmless Error in the Penalty Phase of a Capital Case: A Doctrine Misunderstood and Misapplied* (1995) 28 Ga. L.Rev. 125, 126, 149–150.) It bears emphasis that "this court is [not] entitled legally to make the determination of whether appellant is to live or be put to death. The determination of what penalty shall be imposed rests exclusively with the jury." (*People v. Hamilton* (1963) 60 Cal.2d 105, 138; cf. *Ring v. Arizona* (2002) 536 U.S. 584, 614 (conc. opn. of

25

Breyer, J.) ["the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death"].)

## B.

There is no easy solution for navigating these tensions either in the mine run of harmless error cases or in cases involving error in the penalty phase of a capital trial. But appellate courts can mitigate the risks associated with harmless error review by complying strictly with the standards established by law to guide such review. Rigorous adherence to these standards serves to maintain the crucial role of appellate review in promoting adherence to the law, to restrain reviewing courts from invading the province of the jury, and to preserve jury verdicts that may be deemed untainted by error based on disciplined application of a legally specified confidence level rather than an appellate judge's ad hoc intuitions of guilt, innocence, or just punishment.

As today's opinion acknowledges, the *Chapman* harmless error standard applies to defendant's federal constitutional claims. (Maj. opn., *ante*, at p. 25.) *Chapman* has two principal features. First, a finding of harmless error requires a showing "beyond a reasonable doubt" that the error did not affect the jury's verdict. (*Chapman*, *supra*, 386 U.S. at p. 24.) The reasonable doubt standard has long been understood to indicate "the very high level of probability required by the Constitution" to deprive an individual of life or liberty. (*Victor v. Nebraska* (1994) 511 U.S. 1, 14.) The requirement is not one of absolute certainty. (See *id.* at p. 17 ["A fanciful doubt is not a reasonable doubt."]; Pen. Code, § 1096 [reasonable doubt " 'is not a mere possible doubt' "].) But the standard is, and is intended to be, very stringent; it is not satisfied so long as there is a doubt "based upon 'reason.' " (*Jackson v. Virginia* (1979) 443 U.S. 307, 317.) The stringency of the standard reflects not only its protective function but also its amenability to principled application. Under *Chapman*, a reviewing court need not calibrate its

26

certitude to some vaguely specified probability; instead, the court must be convinced the error was harmless to the *maximal level of certainty within the realm of reason*, a level that admits no reasonable doubt.

Second, the burden of proving beyond a reasonable doubt that the error did not affect the jury's verdict lies with "the beneficiary of the error," namely, the state. (*Chapman*, *supra*, 386 U.S. at p. 24; see *Deck*, *supra*, 544 U.S. at p. 635; *United States* v. *Dominguez Benitez* (2004) 542 U.S. 74, 81, fn. 7; *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 295–296; *Satterwhite v. Texas* (1988) 486 U.S. 249, 256.) Under *Chapman*, it is not the defendant's burden to show that the error *did* have adverse effects; it is the state's burden to show that the error *did not* have adverse effects. Because it may be difficult to determine whether a particular error contributed to the jury's verdict given the counterfactual nature of the inquiry, "the allocation of the burden of proving harmlessness can be outcome determinative in some cases." (*Gamache*, 562 U.S. at p. __ [131 S.Ct. at p. 593] (statement of Sotomayor, J.).)

The significance of this burden allocation has been confirmed by high court precedent since *Chapman*. In *Riggins*, the high court reversed a capital conviction where the defendant was unconstitutionally forced to take antipsychotic drugs during the course of his trial. (*Riggins*, *supra*, 504 U.S. at p. 138.) In deciding that the error was prejudicial, the high court made no finding that the medication actually affected the defendant's outward appearance, testimony, ability to follow the proceedings, or communication with counsel; the court simply said such effects were "clearly possible." (*Id.* at p. 137.) While acknowledging that "the precise consequences of forcing antipsychotic medication upon Riggins cannot be shown from a trial transcript," the high court held that Riggins need not "demonstrate how the trial would have proceeded differently" in order to prevail. (*Ibid.*) *Riggins* reversed the conviction upon observing that "[e]fforts to prove or

disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different if [the defendant had not been unlawfully medicated] would be purely speculative." (*Ibid.*)

The high court's decision in *O'Neal v. McAninch* (1995) 513 U.S. 432 (*O'Neal*) likewise underscores that the state bears the burden of demonstrating the absence of prejudice and that this burden allocation can be dispositive. In *O'Neal*, the defendant had been convicted in state court of murder and other crimes, but the Sixth Circuit on habeas review held that the trial court had given a misleading jury instruction in violation of the Constitution. The question before the high court was whether an error may be deemed harmless in "the special circumstance in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict. (By 'grave doubt,' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.)" (*Id.* at p. 435.) *O'Neal* held that in such cases "the petitioner must win" (*id.* at p. 437), relying significantly on *Chapman*'s rule that " 'constitutional error . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless' " (*id.* at p. 438, quoting *Chapman*, *supra*, 386 U.S. at p. 24). *O'Neal* thus confirms that an error cannot be found harmless under *Chapman* even when a reviewing court is not convinced but is genuinely unsure that there is a reasonable possibility that the error affected the verdict. The burden is on the state, not the defendant, to dispel the uncertainty.

## C.

In the present case, a straightforward application of *Chapman* leads to the conclusion that the death judgment must be reversed. Not only did defendant expressly complain about the stun belt; the record also gives rise to reasonable concern about the belt's effect on defendant's demeanor, an important consideration for the jury in a capital penalty proceeding. Further, the

28

prosecution's case for death at the penalty retrial was not overwhelming, and the first penalty phase, which set forth no less persuasive a case for death, resulted in a hung jury. These considerations are more than sufficient to prevent us from concluding beyond a reasonable doubt that the stun belt error did not affect the penalty verdict.

As context for examining the particulars of this case, it bears mention that less than five years ago, in *People v. Stevens* (2009) 47 Cal.4th 625 (*Stevens*), we described the use of stun belts for purposes of courtroom security as an "exceptional practice[]" that is "inherently prejudicial." (*Id.* at pp. 632, 644.) *Stevens* held that "the stationing of a courtroom deputy next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need." (*Id.* at p. 629.) In reaching this conclusion, we drew a contrast between the presence of security officers in the courtroom and "visible shackling, stun belts, or other affronts to human dignity" that are "[i]nherently prejudicial practices." (*Id.* at p. 644.) In this context, the term "inherently prejudicial" does not mean that erroneous use of a physical restraint requires automatic reversal. But it does mean that the use of a stun belt carries a "substantial risk of prejudice" and "an inordinate risk of infringing upon a criminal defendant's right to a fair trial." (*Id.* at p. 632; accord, *Durham*, *supra*, 287 F.3d at p. 1305.) This substantial risk of prejudice underscores the heavy burden the state must meet to demonstrate that the stun belt error was harmless beyond a reasonable doubt.

As we said in *Mar,* "requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may . . . adversely affect his or her demeanor in the presence of the jury." (*Mar*, *supra*, 28 Cal.4th at p. 1205.) This concern is borne out in the record here. From the beginning, defendant repeatedly complained about the stun belt. On April 6, 1999,

29

when defendant was first fitted with the device at the guilt phase, defense counsel observed that it prevented his client from leaning back and that "it's going to be very uncomfortable." Defendant said, "It's punching up in my side." Defendant was also worried about setting off the belt inadvertently. As the attending deputy stated in the course of trying to reposition the device, "I think he's concerned it's going to activate it, but just by leaning on it, it won't activate it." The deputy said that "[t]he belt is designed to be worn around the waist tightly" and that according to the belt's instructions, "[i]t needs to be near the kidney." Eventually, defendant was fitted with a pillow to cushion the belt, and he said, "That's a little better." Still, defendant continued to complain about the tightness of the belt, and the trial court observed, "It really is bulky. I can see how it would be uncomfortable."

Defense counsel reiterated these concerns on October 21, 1999 before the penalty phase retrial, stating: "Well, I would object to the belt, not only as I believe it's unnecessary, but it's extremely uncomfortable for the defendant." When the trial judge (who was new to the case) said, "I have not been aware . . . that there has been that much of an uncomfortable feeling for the defendant by reason of the react belt," defense counsel pushed back and expressed concern about the stun belt's potential effect on defendant's demeanor: "The trial days are long, and what my concern is is that the belt is uncomfortable. It's a large object that's placed on the kidney area, the liver area on his back. It makes it difficult to sit back. . . . I'm worried about any unconscious grimacing or exhibitions of discomfort that Mr. Jackson might make that might be misconstrued by the jury as a reaction to witness testimony or anything like that. But we did in the last trial try to alleviate that discomfort by giving him a pillow to kind of even out the back so when he sat back, he wouldn't be putting all the pressure onto that react unit that's strapped to him. That caused a little bit of relief, but I don't think significant."

30

In addition to defense counsel's statement, the record elsewhere reveals reasonable grounds for concern that the stun belt may have "impair[ed] the defendant's ability to . . . maintain a positive demeanor before the jury." (*Mar*, *supra*, 28 Cal.4th at p. 1226.) On May 20, 1999, during the first penalty phase, the defense moved to preclude the prosecution from commenting on defendant's courtroom demeanor. In granting the motion, the trial court said: "The only real issue is lack of emotion at this point." Today's opinion says this observation "read in context" reflects no concern related to the belt. (Maj. opn., *ante*, at p. 21.) But when one reads the full transcript, one finds nothing to suggest that defendant's lack of emotion was, as the court speculates, merely an impassive response to the testimony of the prosecution's witnesses rather than a foreseeable effect of wearing the stun belt. It is hardly unreasonable to think that lack of emotion may be one effect of being forced to wear an electric shock device that is susceptible to accidental activation and designed to achieve " ' "total psychological supremacy" ' " through the threat of " 'debilitating pain.' " (*Mar*, at pp. 1215, 1226.) I suspect most people, with such a device strapped around the waist, would sit as still and impassively as they possibly could in order to avoid activating it. (I would hesitate to even sneeze.)

The possibility of prejudice resulting from modification of a defendant's demeanor during a capital sentencing proceeding is not insignificant. "As any trial attorney will attest, serious prejudice could result if [an extraneous influence] inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be

31

determinative of whether the offender lives or dies." (*Riggins*, *supra*, 504 U.S. at pp. 143–144 (conc. opn. of Kennedy, J.); see Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty* (1998) 83 Cornell L.Rev. 1557.) Our own cases have repeatedly held that a defendant's courtroom demeanor is relevant to the jury's determination of the defendant's character in the penalty phase of a capital trial. (See *People v. Valencia* (2008) 43 Cal.4th 268, 307–308 [collecting cases].) And we have said it is not improper for a trial court to observe that " '[t]he defendant was emotionally calm during the entire trial' " in denying a motion to modify a death verdict because "[a] defendant's demeanor may reflect remorse, or otherwise arouse sympathy in either jury or judge," and is therefore "relevant" to the sentencing decision. (*People v. Williams* (1988) 44 Cal.3d 883, 970, fn. 50, 971–972.)

The stun belt's effect on defendant's demeanor may have been especially significant at one crucial point during the penalty retrial. On November 17, 1999, the prosecution alerted the court that defendant had engaged in some "verbal and non-verbal communication" with members of his family. The court advised defendant that "the bailiff will take actions if you do it again." Defendant could have reasonably interpreted this statement as a warning that the bailiff would activate the stun belt if defendant were to engage in any further verbal or nonverbal communication with his family. Immediately following this exchange, defendant's mother testified. It is reasonable to believe that the jury would have found it particularly off-putting if defendant had remained expressionless while his mother recounted the extensive emotional, physical, and sexual abuse she had suffered in front of defendant, as well as the beatings that defendant had suffered in trying to protect her. As defense counsel observed in closing argument, the mother's testimony caused defendant's brother Antione, a Gulf War veteran, to "run from the courtroom crying." If there was one moment in the penalty phase

32

when the jury might have expected defendant to visibly demonstrate his capacity for empathy or compassion, it was during his mother's testimony — right after the trial court had warned him that "the bailiff will take actions" if he engaged in any verbal or nonverbal communication with members of his family.

Finally, the weakness of the prosecution's case for death makes it even more reasonable to believe that the stun belt error may have affected the jury's verdict. The most significant and objective indicator of that weakness is the fact that the first penalty phase jury found the case to be very close and was ultimately unable to reach a verdict. A jury's inability to reach a verdict is often indicative of weakness in the prosecution's case and probative of an error's prejudicial effect. (See, e.g., *Kyles v. Whitley* (1995) 514 U.S. 419, 554; *Krulewitch v. United States* (1949) 336 U.S. 440, 445; *Kennedy v. Lockyer* (9th Cir. 2004) 379 F.3d 1041, 1056, fn. 18; *United States v. Beckman* (8th Cir. 2000) 222 F.3d 512, 525; *United States v. Tubol* (2d Cir. 1999) 191 F.3d 88, 97; *People v. Figueroa* (1986) 41 Cal.3d 714, 722; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1055; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1430.) The first jury expressly confirmed that the penalty decision was close in a note it sent to the trial court on May 27, 1999 shortly before the court declared a mistrial. That note indicated there were nine jurors who believed the issue was close enough that they were willing to go either way and one or two jurors who were firmly against imposing death.

Although the murder of Monique Cleveland (Monique) may well be the kind of crime worthy of a death sentence, the first jury's hesitation to impose death suggests it may have been unsure whether defendant was the one who actually shot Monique. (Cf. *Enmund v. Florida* (1982) 458 U.S. 782, 794 [noting juries' reluctance to impose the death penalty "for accomplice liability in felony murders"].) No one who testified at the trial had witnessed Monique's murder. Two of the prosecution's main witnesses, Kevin Jackson and Donald Profit,

33

testified that defendant said he shot Monique, but neither was present at the crime. The third main witness, Robert Cleveland (Robert), "began losing consciousness and was only vaguely aware of hearing additional gunshots" after he had been shot. (Maj. opn., *ante*, at p. 4.) Further, both Robert's testimony and Kevin Jackson's indicated that one or more of defendant's confederates had entered the Clevelands' house before Monique was shot. The first jury's uncertainty is reflected in another note it sent to the trial court on May 27, 1999, asking about the role that lingering doubt could play in its deliberations. In light of the evidence presented, it is reasonable to suspect that the jury had lingering doubt as to whether defendant shot Monique, an issue that was irrelevant at the guilt phase but obviously relevant at the penalty phase.

The evidence at the penalty retrial did not present a more compelling case for death. If anything, the prosecution's case was weaker. The first jury heard three versions of the crimes — one from Donald Profit, another from Kevin Jackson, and a third from Robert Cleveland, a surviving victim who had suffered gunshot injuries to his face, upper back, and abdomen. The second jury heard only Kevin Jackson's testimony. In addition to being a convicted felon and an admitted drug dealer, Kevin Jackson was not present at the shooting and, to the jury's knowledge, was testifying pursuant to a deal with the prosecution. His testimony was based on a story defendant had told him while they smoked marijuana together a few days after the shooting.

There was little new evidence at the penalty retrial. The prosecution submitted a redacted autopsy photograph of a one-month-old embryo found in Monique's womb. The photograph is rather clinical and "is neither gory nor particularly disturbing." (Maj. opn., *ante*, at p. 37.) The prosecution also put on testimony by Correctional Sergeant Vern Nichols, who described an incident in which defendant and two other inmates refused an officer's order to "get down."

34

"One of the three inmates told the officer, 'Fuck you. We don't have to get down,' but Nichols was not sure whether it had been defendant." (*Id.* at p. 8.) This evidence "was not especially prejudicial, particularly since the guard acknowledged that the three inmates were not a 'direct threat' to him, and the prosecution made no mention of the incident in its closing argument." (*Id.* at p. 42.) Finally, the prosecution put on testimony by Officer Damon Aoki, who, after arresting defendant, heard defendant say he would have shot Aoki "if he had had a gun." Although this statement was admissible to show defendant's consciousness of guilt (*id.* at p. 31), defendant's guilt was not in doubt. Officer Aoki's testimony thus had limited value at the penalty retrial. (See *id.* at p. 31 ["Despite presenting this testimony to the jury, the prosecution made no mention of it during closing arguments."].)

The witnesses for the defense, meanwhile, expanded on the testimony they had given in the first penalty phase. Defendant's brother Antione added that their mother had abused them when they were children. Defendant's mother added that she had forced defendant to participate in a gang-related fight and that she had been raped in front of him on multiple occasions. It was during this powerful testimony by defendant's mother — testimony that the jury might reasonably have expected to elicit an emotional response from defendant — that the trial court's error in forcing defendant to wear the stun belt may have been most prejudicial.

In sum, there is a reasonable possibility that the unlawful use of the stun belt adversely affected defendant's demeanor and in turn influenced the jury's decision to impose death. On this record, I am unable to conclude that the stun belt error was harmless beyond a reasonable doubt.

## D.

The court today holds otherwise based on a different reading of the record. Its harmless error analysis consists of three contentions: First, any time defendant

35

complained about the stun belt, his complaints were adequately addressed. Second, any time defendant was not complaining about the stun belt, we must infer that the stun belt did not adversely affect him. Third, the record affirmatively demonstrates the absence of prejudice. None of these contentions withstands scrutiny.

As to the first, the court would have us believe that the pillow provided to defendant and the adjustments made to the placement and tightness of the stun belt on defendant's body were sufficient to address his complaints at the start of the guilt phase and again at the start of the penalty retrial. (Maj. opn., *ante*, at pp. 20, 23.) But this rendition is belied by statements at the penalty retrial that the court simply ignores, statements informed by defendant's actual experience of wearing the belt throughout the guilt phase and first penalty phase. (See *ante*, at pp. 18–19, 30.) I quote them again here: On October 21, 1999, defense counsel objected to the stun belt at the penalty retrial, saying "it's extremely uncomfortable for the defendant." When the trial court said, "I have not been aware . . . that there has been that much of an uncomfortable feeling for the defendant by reason of the react belt," defense counsel pressed the point: "The trial days are long, and what my concern is is that the belt is uncomfortable. It's a large object that's placed on the kidney area, the liver area on his back. It makes it difficult to sit back. . . . But we did in the last trial try to alleviate that discomfort by giving him a pillow to kind of even out the back so when he sat back, he wouldn't be putting all the pressure onto that react unit that's strapped to him. That caused a little bit of relief, but I don't think significant." The trial court again provided defendant with a pillow but took no other steps to address defendant's complaints. Thus, defendant was no better off during the penalty retrial than he had been during the guilt phase and first penalty trial — as defense counsel put it, "extremely uncomfortable."

36

Further, the court discounts the attending deputy's observation on April 6, 1999 that defendant was worried about accidental activation ("I think he's concerned [leaning back is] going to activate it"). The court says that "the defense offered no indication that defendant actually had this worry" and that "[t]hroughout the duration of both trials, the defense never once stated or suggested that the threat of electric shock affected defendant's mental state or that the belt caused him to experience mental stress or impairment." (Maj. opn., *ante*, at p. 20.) Apparently the court would have us believe that the deputy's observation of defendant's concern about accidental activation lacks reasonable credibility because defendant did not state the concern himself or through counsel. If common sense were not enough to refute this suggestion, one need only consult our opinion in *Mar*, where we prominently discussed the risk of accidental activation not once, not twice, not thrice, but *six different times* as "a strong reason to proceed with great caution in approving the use of this device." (*Mar*, *supra*, 28 Cal.4th at p. 1205; see *id.* at pp. 1206, 1219, 1226, 1228–1229; see also *Durham*, *supra*, 287 F.3d at p. 1306 ["It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt. A defendant is likely to concentrate on doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial."].)

The court's treatment of defendant's concern about accidental activation is symptomatic of its second thesis, that silence equals acquiescence for purposes of harmless error analysis. The court assigns great significance to the fact that "the defense made no mention at either trial of the stun belt's potential or actual effects on defendant's mental state" and to defendant's "complete failure to mention the stun belt or its effects in any of his various motions for a mistrial, a new guilt trial, and a new penalty trial." (Maj. opn., *ante*, at p. 23.) But why would we expect

37

defendant to have continued complaining about the effects of the belt after his objections to wearing it had proven fruitless?  By the time defendant was forced to wear the belt during the penalty retrial, the trial court had already rebuffed his objections twice — the second time notwithstanding defense counsel's statement that it had been "extremely uncomfortable" for defendant to wear the belt throughout the guilt phase and first penalty phase.  Perhaps defendant believed, reasonably, that he had already made a sufficient record.  Perhaps defendant believed, reasonably, that under the only authority at the time (see *Garcia*, *supra*, 56 Cal.App.4th at p. 1356, disapproved by *Mar*, *supra*, 28 Cal.4th at p. 1219), there was no point in complaining further.

Further, the court says the record provides no indication that defendant's lack of emotion resulted from wearing the stun belt or that he feared activation of the stun belt when the trial court warned, right before his mother's testimony, that "the bailiff will take actions" if he engaged in verbal or nonverbal communication with his family.  (Maj. opn., *ante*, at p. 21.)  But these possibilities are surely reasonable.  They are no less reasonable than the court's own conjectures that the stun belt did *not* contribute to defendant's lack of emotion and that defendant did *not* construe the trial court's warning as a reference to the stun belt.

More fundamentally, the court's one-sided inferences from silence in the record effectively place the burden on defendant to have made a record demonstrating prejudice from the stun belt error.  Indeed, the court says as much when it declares that "reversal of a judgment is unwarranted when the record on appeal is devoid of evidence that the unjustified use of . . . a stun belt had any adverse effect."  (Maj. opn., *ante*, at p. 14.)  That is plainly not the law.  In *Riggins*, the dissent argued that the defendant was not legally incompetent and that "[t]he record does not reveal any other form of unfairness relating to the purported side effects of [the forced medication].  Riggins has failed to allege specific facts

38

to support his claim that he could not participate effectively in his defense.  He has not stated how he would have directed his counsel to examine or cross-examine witnesses differently.  He has not identified any testimony or instructions that he did not understand.  The record, moreover, does not even support his assertion that [the medication] made him worse off." (*Riggins*, *supra*, 504 U.S. at pp. 149–150 (dis. opn. of Thomas, J.).)  But the high court in *Riggins* disclaimed any need for the defendant to prove "actual prejudice" and reversed the conviction on the ground that prejudice was "clearly possible." (*Id.* at p. 137.)

Similarly, in *Mar*, we said "[i]t is not explicitly apparent from the transcript of the proceedings what effect the stun belt had on the content of defendant's testimony or on his demeanor while testifying." (*Mar*, *supra*, 28 Cal.4th at p. 1213.)  The record showed only that the defendant was "nervous while testifying," which "is, of course, not unusual for a defendant, or any witness," and that defendant at one point expressed concern about accidental activation. (*Id.* at p. 1224; see *id.* at p. 1232 (dis. opn. of Brown, J.).)  Yet, in reversing the conviction, we said that "in view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict," "it is reasonable to conclude that defendant's being required to wear the stun belt had at least some effect on his demeanor while testifying." (*Id.* at pp. 1224–1225.)

The Eleventh Circuit in *Durham* likewise found prejudicial stun belt error on a record that contained only nonspecific assertions by defense counsel that wearing the belt would induce " 'extreme fear' " that "chills the exercise of the defendant's trial rights, including altering his outward appearance and affecting his decision whether or not to testify, his ability to follow the proceedings, the substance of his communication with counsel, and his ability to actively cooperate with and assist counsel.' " (*Durham*, *supra*, 287 F.3d at pp. 1310–1311 (conc. opn. of Tjoflat, J.).)  Nothing in the record indicated that any of these concerns

39

actually came to pass during the trial. Yet the court reversed the conviction because "[t]he government ha[d] not demonstrated that Durham's defense was not harmed by" the stun belt. (*Id.* at p. 1309.) Applying *Chapman*, the court said it is not "sufficient for the government to argue that the defendant cannot name any outcome-determinative issues or arguments that would have been raised had he been able to participate at trial. Not only does such an argument impermissibly transfer the burden of proof back to the defendant, but it also would eviscerate the right in all cases where there is strong proof of guilt." (*Ibid.*)

As *Riggins*, *Mar*, and *Durham* illustrate, silence in the record with respect to actual prejudice does not dispel a reasonable possibility of prejudice, especially when the error is one that carries a "substantial risk" of prejudice. (*Durham*, *supra*, 287 F.3d at p. 1305; *Stevens*, *supra*, 47 Cal.4th at p. 632.) To say that "reversal of a judgment is unwarranted when the record on appeal is devoid of evidence that the [error] had any adverse effect" (maj. opn., *ante*, at p. 14) is to effectively place the burden on defendant to demonstrate actual prejudice. In this respect, today's opinion contravenes *Chapman*.

The court's third and last resort is its remarkable claim that the record "affirmatively demonstrat[es] the assessment of defense counsel that the jurors' consideration of defendant's courtroom demeanor would have a *favorable* effect on their penalty determination." (Maj. opn., *ante*, at p. 22.) According to the court, this assessment may be inferred from defense counsel's insistence on two special jury instructions proposed in a May 25, 1999 filing at the first penalty trial and again in a November 18, 1999 filing at the second penalty trial. Here is what the two proposed instructions say: (1) "PROPOSED PENALTY PHASE INSTRUCTION NO. 10 [¶] Mitigating factors are not necessarily limited to those adduced from specific evidence offered at the sentencing hearing such as character testimony. A juror might be disposed to grant mercy based on other factors, such

40

as a humane perception of the developed during trial." (2) "PROPOSED PENALTY PHASE INSTRUCTION NO. 11 [¶] If a mitigating circumstance or an aspect of the defendant's background or his character called to the attention of the jury by the evidence or its observation of the defendant arouses mercy, sympathy, empathy, or compassion such as to persuade you that death is not the appropriate penalty, you may act in response thereto and impose a sentence of life without possibility of parole." At the May 24, 1999 and November 18, 1999 hearings on these proposed instructions, the parties and the trial court regarded them as essentially the same.

As an initial matter, this is an argument entirely of the court's own invention, as the Attorney General nowhere relied on this aspect of the record to demonstrate harmless error. The court's reliance on this argument seems a rather questionable way to adjudicate whether *the state* has carried *its burden* of proving the absence of prejudice beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

In any event, it is no wonder that the Attorney General never made this argument in her briefing or at oral argument. From the text of the two proposed instructions and from the transcripts of the two hearings on those instructions, it is clear that defense counsel sought to inform the jury that *if* its observation of defendant aroused mercy, sympathy, empathy, or compassion, then it could consider this factor in choosing life over death. Defense counsel gave no indication that he believed the jury *would* find defendant's courtroom demeanor to be mitigating. As defense counsel explained at the November 18, 1999 hearing, he was simply seeking to enumerate for the jury as many potentially mitigating factors as he could. The court's assertion that "the only reasonable inference" is that the stun belt did not negatively affect defendant's demeanor (maj. opn., *ante*, at p. 22) would be more convincing if the proposed instructions had merely told

41

the jury it was free to consider defendant's demeanor in its sentencing decision — and left it at that. But a proposed instruction that says the jury may take demeanor into account *if* the jury finds it to be mitigating does not firmly indicate that defense counsel believed defendant's demeanor would weigh in his favor. Rather, the conditional language of the proposed instruction, coupled with defense counsel's opposition to any prosecutorial comment on defendant's demeanor, suggests that defense counsel saw a downside risk to the jury's consideration of demeanor. Indeed, the protective tilt of the proposed instructions was why the prosecutor opposed the instructions and why the trial court at the penalty retrial refused to give them. The court's reliance on this sole aspect of the record as "affirmatively demonstrating" the absence of prejudice (*id.* at p. 22) serves only to underscore the lengths to which the court must go to reach its holding today.

Finally, the court's harmless error analysis is laced with string cites purporting to show that "reversal of a judgment is unwarranted when the record on appeal is devoid of evidence that the unjustified use of *shackles or a stun belt* had any adverse effect." (Maj. opn., *ante*, at p. 14, italics added; see *id.* at pp. 14–15, 24–25.) But this conflation of shackles and stun belts elides an important distinction.

Most of the cases cited by the court involved traditional physical restraints like shackles, leg restraints, or handcuffs. We have consistently found the use of such restraints to be harmless where the jury never saw the restraints and where no evidence suggests they affected the defendant's decision to testify or any other aspect of the defense. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1322 (*Foster*); *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 155 (*Letner*); *People v. Ervine* (2009) 47 Cal.4th 745, 773–774; *People v. Wallace* (2008) 44 Cal.4th 1032, 1051; *People v. Combs* (2004) 34 Cal.4th 821, 838–839; *People v. Anderson* (2001) 25 Cal.4th 543, 596; *Cox*, *supra*, 53 Cal.3d at p. 652.) These cases stand to

reason because the principal vector of prejudice when it comes to shackles, leg restraints, or handcuffs is its visibility to the jury, which erodes the presumption of innocence.

By contrast, "the greatest danger of prejudice [from improper use of a stun belt] arises from the potential adverse psychological effects of the device upon the defendant rather than from the visibility of the device to the jury." (*Mar*, *supra*, 28 Cal.4th at p. 1225, fn. 7.) No case law suggests that traditional restraints have the potential to achieve the " ' "total psychological supremacy" ' " over the defendant that a stun belt is designed to achieve. (*Id.* at p. 1226.) Indeed, this court in *Letner* quoted *Mar*'s graphic description of what a stun belt does to a person when activated and said "[t]here is no evidence that the leg brace worn by Letner created a remotely comparable level of potential pain, injury, and humiliation, such that Letner's ability to concentrate and participate in the trial proceedings similarly might have been affected." (*Letner*, *supra*, 50 Cal.4th at p. 156.) Thus, our cases finding the invisible use of traditional restraints harmless in the absence of affirmative evidence that the defense was impaired do not suggest an equivalent rule for stun belts.

Our cases that have found erroneous use of a stun belt to be harmless likewise do not support today's holding. In *People v. Manibusan* (2013) 58 Cal.4th 40, the defendant expressly agreed to wear the belt, so it is unsurprising we found any error to be harmless in the absence of evidence showing an adverse effect. (*Id.* at pp. 85–86; accord, *Stanford v. State* (Ga. 2000) 528 S.E.2d 246, 249–250 [finding harmless error where the defendant did not object to wearing a stun belt and the record did not show prejudice]; *State v. Johnson* (Ohio 2006) 858 N.E.2d 1144, 1179–1180 [same].) In *People v. Virgil*, *supra*, 51 Cal.4th 1210, we held that the trial court did not err in ordering the use of a stun belt, and we did not engage in harmless error analysis. (*Id.* at p. 1271.) In *Foster*, the defendant did

43

not object to the stun belt, and we deemed the issue forfeited. (*Foster*, *supra*, 50 Cal.4th at pp. 1321–1322.)

That leaves *Howard*, *supra*, 51 Cal.4th 15, the case on which the court principally relies. (Maj. opn., *ante*, at p. 22.) But our finding of harmless error in that case turned "[m]ost significantly" on our observation that "at sentencing defendant made an extended statement to the court regarding his mental state during trial. He made no reference to a stun belt or its effects on his demeanor while testifying. Instead, defendant claimed his testimony had been affected by antipsychotic medication." (*Howard*, at p. 29.) We concluded that "the record affirmatively dispels any notion that [the defendant] was prejudiced" because the stun belt "had no appreciable effect on him, even by his own account." (*Id.* at pp. 28, 30; see *id.* at p. 30, fn. 6 ["[T]he concern that defendant may have been psychologically affected by a stun belt in this case was put to rest by his own statements to the court about his mental state during trial."].) Because the record here does not include any fact remotely similar to the fact we found dispositive in *Howard*, it strains credulity to say that the record in this case, as in *Howard*, "affirmatively dispels any notion of prejudice." (Maj. opn., *ante*, at p. 24.)

In sum, today's opinion dismisses any possibility of prejudice at the penalty retrial as "pure conjecture." (Maj. opn., *ante*, at p. 21.) Even though defendant repeatedly complained about the belt, even though he naturally worried about accidental activation, even though the trial court observed "lack of emotion" in his demeanor, even though the trial court warned right before his mother testified that "the bailiff will take actions" if he engaged in any verbal or nonverbal communication with his family, and even though the first jury hung at the penalty phase, the court says it is certain beyond a reasonable doubt that the jury would have reached the same verdict absent the stun belt error. Now *that* is pure

44

conjecture — and it is conjecture based on reasoning plainly at odds with *Chapman*.

## III.

Observers of this court have long noted the prominent role of harmless error doctrine in our death penalty jurisprudence. One study of 215 capital cases decided by this court between 1986 and 1996 reported that the court found guilt phase error in 55% of the cases and penalty-phase error in 74% of the cases, but found 93% of guilt phase errors and 85% of penalty-phase errors to be harmless, producing a reversal rate of 3.8% for guilt verdicts and 11% for death verdicts. (Kamin, *Harmless Error and the Rights/Remedies Split* (2002) 88 Va. L.Rev. 1, 70.) By contrast, 33% of the death sentences meted out nationally from 1986 through 1996 have been overturned on appeal or collateral review, and the reversal rate is even higher for death judgments prior to 1986. (U.S. Dept. Justice, Bur. of Justice Statistics, Capital Punishment, 2001 – Statistical Tables (2013) p. 19, table 16, available at http://www.bjs.gov/content/pub/pdf/cp11st.pdf [as of Mar. 3, 2014]; see Liebman et al., *Capital Attrition: Error Rates in Capital Cases, 1973– 1995* (2000) 78 Tex. L.Rev. 1839, 1850 [reporting that state and federal courts nationwide found prejudicial error in 68% of capital cases between 1973 and 1995].)

Unfortunately, the dubious reasoning in today's decision is not an isolated lapse in our harmless error jurisprudence. For example, just as the court here supplies an argument on the state's behalf that the state itself never made in confronting its burden to demonstrate harmless error (*ante*, at p. 41), the court in another case recently found the omission of a reasonable doubt instruction to be harmless under *Chapman* despite the state's *concession* in its answer brief that the error required reversal. (*People v. Aranda* (2012) 55 Cal.4th 342, 379, 383 (conc. & dis. opn. of Liu, J.) (*Aranda*).)

45

In addition, the court's willingness to infer no reasonable possibility of prejudice where the record is silent or indeterminate as to actual prejudice is a recurring maneuver in our harmless error doctrine. Consider, for example, the reasoning in *People v. Whitt* (1990) 51 Cal.3d 620 (*Whitt*). The defendant in *Whitt* had taken the witness stand during the penalty phase of his capital trial. In response to two questions posed by defense counsel — "Do you want to live?" and "Why do you deserve to live?" — the prosecutor objected, and the trial court sustained the objections. (*Id.* at p. 646.) This court held that the trial court's rulings, by denying the defendant an opportunity to plead for his life before the jury, "violated his federal constitutional right to have the sentencer consider all relevant mitigating evidence." (*Id.* at p. 647.) But the court went on to find the error harmless under *Chapman*: "In this case, though the question 'Why do you deserve to live?' *might* produce a significant answer, the phraseology is so inherently broad, and the range of conceivable answers so vast, that we cannot know whether defendant's actual response might have influenced the penalty determination." (*Id.* at p. 648.) Reversal was not warranted under these circumstances, this court concluded, because the defendant had not made a record of what he would have said and thus prejudice could not be assessed. (*Ibid.*) As to *Chapman*'s mandate that the burden is on the state to prove the error was harmless beyond a reasonable doubt, the court said "the 'state-burden' language in *Chapman* does not literally mean that an appellate court must reverse the judgment because the prosecution has failed to place evidence in the record showing that the error was harmless. Rather, *Chapman* . . . [means that] where federal constitutional error occurs and *prejudice can be assessed from the record*, there is a strong presumption that the defendant was prejudiced." (*Id.* at p. 649, italics added.)

Three justices dissented.  Justice Mosk explained that the court's "analysis rests on an implied premise that the burden of proof as to prejudice rests on the person complaining of the error.  But as the very words of *Chapman* demonstrate, that premise is radically unsound:  'Certainly error, constitutional error, . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless . . . .  [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  (386 U.S. at p. 24.)"  (*Whitt*, *supra*, 51 Cal.3d at p. 666 (conc. & dis. opn. of Mosk, J.).)  "The People simply fail to carry that burden.  Because of the error, we cannot know what specific answers defendant might have given or what precise force those answers might have carried.  The void in the record is indeed disturbing.  But it is the People that created the void.  And it is the People that must bear the responsibility."  (*Ibid.*)  Justice Kennard similarly explained: "To condition an evaluation of federal constitutional error on a defendant's offer of proof, as the majority does, relieves the beneficiary of the error (the prosecution) of the obligation to demonstrate that the error did not affect the verdict, and impermissibly shifts to the defendant the burden of proving prejudice."  (*Id.* at pp. 671–672 (conc. & dis. opn. of Kennard, J.); see also *id.* at pp. 668–669 (conc. & dis. opn. of Broussard, J.).)

*Whitt* was not wrong to say that "the 'state-burden' language in *Chapman* does not literally mean that an appellate court must reverse the judgment because the prosecution has failed to place evidence in the record showing that the error was harmless."  (*Whitt*, *supra*, 51 Cal.3d at p. 649.)  The state's burden in a harmless error inquiry is not a traditional evidentiary burden of production.  As the high court has observed, harmless error inquiry "does not involve a judge who shifts a 'burden' to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the

47

presentation of evidence is no longer likely to affect." (*O'Neal*, *supra*, 513 U.S. at p. 436.)

However, to say that the prosecution bears no burden of production is not to say that reversal is unwarranted whenever a defendant who objected to the error has not made a record from which a reviewing court may assess prejudice. *Whitt* found harmless error on the rationale that "we cannot know whether defendant's actual response might have influenced the penalty determination" (*Whitt*, *supra*, 51 Cal.3d at p. 648); in other words, the trial court's error might or might not have affected the verdict. If the infirmity of this reasoning were not already evident in light of *Chapman*, it is surely evident in light of *O'Neal*, where the high court, relying on *Chapman*, made clear that an error cannot be found harmless where "the matter is so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." (*O'Neal*, *supra*, 513 U.S. at p. 435.) Similarly, in *Riggins*, the high court reversed a capital conviction where "[e]fforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different [without the error] would be purely speculative." (*Riggins*, *supra*, 504 U.S. at p. 137.) *Whitt* misapplied *Chapman* and cannot survive the high court's subsequent precedent. And yet, this court continues to cite *Whitt* for the proposition that no cognizable prejudice can result from the erroneous exclusion of potentially mitigating testimony at the penalty phase of a capital trial unless the defendant can show from the record that the testimony would have affected the verdict. (See, e.g., *People v. Earp* (1999) 20 Cal.4th 826, 891–892, citing *Whitt*, at p. 648.) The court's opinion in this case is cut from the same cloth.

**IV.**

Today's decision confirms that "[a]ppellate judges . . . are often reluctant to open the way to a new trial, given not only the risk of draining judicial resources

48

but also the risk that a guilty defendant may go free" or escape just punishment. (Traynor, *supra*, at p. 50.) Yet "[t]he very reluctance of judges to confront such risks . . . serves to condone errors that may affect a judgment and thus engenders a still more serious risk, the risk of impairing the integrity of appellate review." (*Ibid.*) The *Chapman* rule — both its reasonable doubt standard and its allocation of the burden of persuasion — has long endured as the proper accommodation of these competing risks. When a reviewing court fails to faithfully apply the standard, it compromises the fairness of the proceeding, usurps the jury's function, and weakens the role of appellate review in deterring future errors.

Regrettably, today's decision is only the most recent instance in which this court has deviated from *Chapman*'s mandate. The deviations have occurred in capital cases (see, e.g., *Gamache*, *supra*, 562 U.S. at p. __ [131 S.Ct. at p. 592] (statement of Sotomayor, J.); *Whitt*, *supra*, 51 Cal.3d at pp. 666–668 (conc. & dis. opn. of Mosk, J.)) as well as noncapital cases (see *Aranda*, *supra*, 55 Cal.4th at p. 377 (conc. & dis. opn. of Liu, J.)). Given the precedential force of these decisions, it is reasonable to worry that *Chapman* will continue to mean something different in the courts of California than what the high court has repeatedly said it means.

Today's opinion signals a retreat from the rigorous standards governing the use of stun belts and similar devices. It also deviates from the degree of accuracy and reliability that is required when a jury is entrusted to make the most consequential decision allowed to be made in a court of law. For these reasons, I respectfully dissent from the court's judgment upholding the sentence of death. In all other respects, I join the court's opinion.


LIU, J.


49

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Jackson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S086269
**Date Filed:** March 3, 2014

_____

**Court:** Superior
**County:** Riverside
**Judge:** Edward Webster and Russell Schooling


_____

**Counsel:**

Gilbert Gaynor, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Annie Featherman Fraser and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gilbert Gaynor
Law Office of Gilbert Gaynor
P.O. Box 41159
Santa Barbara, CA  93140-1159
(805) 962-5842

Adrianne S. Denault
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2287